## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LLC, FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES INC. (d/b/a FTX.US), | Adv. Pro. 23-50419 (JTD) |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | |
| DANIEL FRIEDBERG, | |
| Defendant. | |

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Debtors and debtors in possession Alameda Research LLC ("Alameda"), FTX Trading Ltd. ("FTX"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services Inc. (d/b/a FTX.US) ("FTX US") (together, "Plaintiffs") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases"), file this First Amended Complaint to recover damages caused by breaches of fiduciary duties, legal malpractice, and other wrongdoing, and to recover fraudulent transfers. Plaintiffs allege the following based upon personal knowledge as to themselves and their acts based upon their investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      Samuel Bankman-Fried ("Bankman-Fried") and a group of insiders, including Defendant Daniel Friedberg ("Friedberg"), Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh") and Caroline Ellison ("Ellison") (collectively, the "FTX Insiders") orchestrated a vast fraudulent scheme to profit at the expense of the Debtors in these Chapter 11 Cases (the "Debtors" or the "FTX Group") and their creditors.

2.      Friedberg, a seasoned lawyer who was decades senior to the twenty-something founders of FTX, was instrumental to this fraudulent scheme and masterminded many aspects of it. From 2017 through FTX's implosion in November 2022, Friedberg advised Bankman-Fried, his trusted inner circle, and the FTX Group on legal and compliance matters and significant transactions. But instead of steering the FTX Group toward propriety, he oversaw flagrantly illegal activity, ignored the FTX Group's glaring lack of internal controls, and served as a "fixer" tasked with, among other things, paying off whistleblowers who threatened to expose the FTX Insiders' fraud. As the Chief Compliance Officer and the top legal officer of the FTX Group, Friedberg oversaw one of the largest compliance failures in history.

3.      Friedberg had long advised Bankman-Fried and the FTX Group, including while he was a partner at the FTX Group's principal outside law firm, Law Firm-1. Friedberg formally

joined the FTX Group in January 2020, and in his time at the FTX Group, he held or assumed the titles of Chief Regulatory Officer, Chief Compliance Officer, and General Counsel of FTX, which oversaw and ran the FTX.com exchange; Executive Vice President and Chief Regulatory/Compliance Officer of FTX US and WRS; General Counsel and Chief Compliance Officer of Bankman-Fried's so-called crypto hedge fund, Alameda; and General Counsel of Alameda Research Ventures Ltd. Friedberg thus was in a unique position to gain, and did gain, deep insight into the FTX Group's convoluted organizational structure, abject lack of internal controls, dubious business practices, and the FTX.com and FTX.US exchanges.

4.      As has been detailed extensively in criminal indictments, the criminal trial of Bankman-Fried, prior civil complaints, and reports filed and issued by the FTX Debtors, far from generating genuine profits, the exponential growth and purported success of the FTX Debtors were, in fact, fueled by a host of reckless and fraudulent practices perpetrated by, and for the benefit of, the FTX Insiders. These practices included, among others, billions of dollars of wildly speculative and unhedged bets in crypto assets and frenzied investment in hundreds of imprudent "ventures," paid for by, among other things, looting the FTX Group of billions in customer deposits.

5.      Under the cloak of this wide-ranging con game, Friedberg facilitated the routing of billions of dollars in purported profits of FTX and the FTX Group to the FTX Insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions. Friedberg himself personally received millions of dollars in unjustified bonuses and other compensation.

6.      While the wholesale raiding of FTX customer exchange deposits and the channeling of billions of dollars of FTX Group assets through so-called lending, investments, political contributions, and donations was concealed from the outside world, it was enabled by Friedberg and other FTX Insiders.  In the course of this scheme, Friedberg directed the preparation of bank-account-opening documents with false statements, paid off and silenced whistleblowers, and supported the fraudulent transfers that enriched Bankman-Fried and other FTX Insiders contrary to the interests of the FTX and FTX US exchanges and the other entities to which Friedberg owed fiduciary duties.  He even helped advance the illegal "arbitrage" trading strategy which got Alameda on its feet, assisted two longtime friends—both of whom were convicted felons—in their attempt to bypass FTX's "know-your-customer" procedures, and disseminated materially false and misleading information to investors.

7.      Existing records document that Friedberg himself received lavish rewards for his 22 months of "service" to Alameda and the FTX US exchange with cryptocurrency worth millions of dollars, as well as handsome monetary compensation and a bonus in excess of $3 million—fraudulent transfers that Plaintiffs now seek to recover, along with any additional undocumented transfers Friedberg received.

8.      Friedberg had a duty to place the interests of the FTX and FTX US exchanges, Alameda, and WRS above the interests of himself and the other FTX Insiders who were indiscriminately siphoning funds from those entities.  Friedberg breached that duty by enabling the raiding of billions of dollars from the exchanges and other entities for his own benefit and the benefit of Bankman-Fried and the other FTX Insiders.

9.      As General Counsel of FTX and Alameda, and Chief Compliance/Regulatory Officer of FTX, FTX US, and WRS, Friedberg also had a duty to these entities to ensure

appropriate internal controls, risk mitigation, and compliance. Friedberg breached those duties by knowingly failing to implement—and in fact obstructing the implementation—of virtually any of the systems or internal controls that would be necessary to properly run the FTX Group's business and by directly contributing to the FTX Group's lack of internal controls.

10.     Under Friedberg's watch as Chief Compliance Officer, billions of dollars in customer assets were looted or simply disappeared. Far from stopping it, Friedberg facilitated this historic theft of others' money.

11.     By this action, Plaintiffs seek to recover damages caused by breaches of Friedberg's fiduciary duties, legal malpractice, and other wrongdoing, and to recover all amounts fraudulently transferred to Friedberg, including any cryptocurrency, bonuses, and any other things of value.

12.     Given Friedberg's egregious conduct, Plaintiffs also seek to disallow any and all claims filed or held by Friedberg in these Chapter 11 Cases pursuant to Section 502(d) of the Bankruptcy Code. Despite Plaintiffs filing this lawsuit against Friedberg on June 27, 2023,[2] on September 18, 2023, Friedberg filed a customer claim against FTX—form number 55107 (the "Customer Proof of Claim")—claiming 57,059 FTT options; 4,425,000 FTX share options; 1,285,000 locked MAPS options; 2,141,667 locked OXY options; 1 MSRM; 1,000 unlocked SRM; and 101,319,118 locked SRM.

## RELEVANT PARTIES

13.     Debtor FTX is incorporated under the law of Antigua and Barbuda.

14.     Debtor Alameda is a Delaware limited liability company that had operations in the United States, Hong Kong, and the Bahamas. Bankman-Fried and Tara Mac Aulay ("Mac Aulay")

---

[2]  *See* Adv. D.I. No. 2.

co-founded Alameda in or around November 2017, and its sole equity owners were Bankman-Fried (90%) and Gary Wang ("Wang") (10%). Bankman-Fried was the Chief Executive Officer ("CEO") of Alameda from its inception until around October 2021. At all relevant times, however, Bankman-Fried retained substantial control over Alameda.

15.     Debtor WRS is a Delaware corporation that is 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders. It began operations in or around January 2020.

16.     Debtor FTX US is a Delaware corporation and a wholly-owned subsidiary of WRS.

17.     Defendant Daniel Friedberg is an attorney licensed in the State of Washington. Prior to joining the FTX Group, Friedberg advised Alameda while in private practice, starting in 2017. In January 2020, Friedberg left private practice and formally joined the FTX Group. At the FTX Group, Friedberg held many titles, including General Counsel of Alameda and FTX and Chief Compliance/Regulatory Officer of FTX, FTX US, and WRS. In those roles, he was a top legal officer for entities which oversaw and ran the FTX.com and FTX.US exchanges.

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it relates to the Chapter 11 Cases, brought under title 11 of the United States Code (the "Bankruptcy Code").

19.     Counts VI through XI are "core" proceedings which may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). Counts I through V are non-core, but are related to the Chapter 11 Cases.

20.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs confirm their consent to the entry of a final order or judgment by the Court in connection with this adversary

proceeding to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## FACTUAL BACKGROUND

### I.     THE FTX GROUP'S FOUNDING

22.     The formation of the FTX Group has been fully detailed in various indictments and prior pleadings. *See, e.g.*, Superseding Indictment ¶ 9-12, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 80.

23.     In short, in November 2017, Bankman-Fried and Mac Aulay co-founded Alameda, which they described as a quantitative trading firm focusing on cryptocurrency.  Friedberg was already advising the FTX Group as a partner at Law Firm-1 at the time Mac Aulay resigned from Alameda in 2018.  Alameda initially focused on arbitrage trading—exploiting price differences between cryptocurrencies (mainly Bitcoin) in the United States and Foreign-Jurisdiction-1, where Bitcoin traded at a roughly 10% to 20% premium.  What was not publicly known is that these arbitrage opportunities required Alameda to skirt regulations and engage certain Foreign-Jurisdiction-1 residents to falsely pretend that Alameda's and the FTX Insiders' trades were in fact their own personal trades—all with Friedberg's knowledge and direct involvement.

24.     As the price gaps exploited by Alameda closed, Alameda attempted to generate profits by making highly speculative bets on cryptocurrency.  Alameda failed to maintain appropriate records and did not implement sufficient internal controls or risk management.  Indeed, multiple former high-level FTX Group executives left the FTX Group due to risk management, governance, and compliance concerns.  These executives include Mac Aulay and the former President of FTX US.

25.     Bankman-Fried and Wang created FTX.com, a cryptocurrency exchange in 2019.

26.     FTX.com quickly became one of the largest digital asset exchanges in the world. Following the initial success of FTX.com, in January 2020, Bankman-Fried followed up by founding FTX US (FTX.US, and together with FTX.com, the "Exchanges"), a digital asset exchange that U.S.-based customers could use.

27.     The Exchanges were extraordinarily successful in attracting customers and their cash, cryptocurrency, and other assets.  By 2021, the Exchanges claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume.

28.     As the world learned in November 2022, in reality the Exchanges served as piggy banks Bankman-Fried and the FTX Insiders looted to fund billions of dollars in recklessly speculative and unhedged trading by Alameda.  The Exchanges also funded billions more in purported "venture" investments, real estate purchases, purported personal "loans," charitable and political contributions and all manner of other transfers designed to benefit themselves by buoying their life-styles, lining their own and their families' and friends' pockets, and ingratiating themselves with numerous business prospects and potential allies.

## II.     FRIEDBERG JOINS THE FTX GROUP AS A TOP EXECUTIVE

29.     From the FTX Group's earliest days, Friedberg served as a key advisor to Sam Bankman-Fried and his companies.  From 2017 to 2019, while a partner at Law Firm-1, Friedberg worked closely with Bankman-Fried and the FTX Group, providing legal advice in connection with general corporate and tax matters, including the formation of specific subsidiaries.  During that time, Joe Bankman, Bankman-Fried's father, urged Bankman-Fried and others to give Friedberg a central role and to keep Friedberg "in the loop ... so we have one person on top of everything."

30.     In January 2020, after two years of serving as the FTX Group's primary contact at Law Firm-1, Bankman-Fried handpicked Friedberg to join the FTX Group.  On January 24, 2020, Bankman-Fried offered him the dual positions of General Counsel of Alameda and Chief Compliance Officer of FTX US, with compensation of a salary of $300,000, a signing bonus of $1.4 million, and an award of 8% equity in FTX US.  On January 29, 2020, Friedberg signed the formal offer letter.

31.     In his 22 months at the FTX Group, Friedberg held or assumed numerous titles, including Chief Regulatory Officer, Chief Compliance Officer, and General Counsel of FTX, which oversaw and ran the FTX.com exchange; Executive Vice President and Chief Regulatory/Compliance Officer of FTX US and WRS; General Counsel and Chief Compliance Officer of Alameda; and General Counsel of Alameda Research Ventures Ltd.  In his roles, Friedberg provided significant legal advice to each of FTX, FTX US, and Alameda, among other entities, and performed work related to the FTX.com and FTX.US exchanges.

32.     Friedberg also served as the Secretary for the Board of Directors at several FTX Group entities including FTX Digital Markets Ltd., FTX Property Holdings Ltd., and FTX US.  Friedberg was also an officer of FTX Digital Markets Ltd., and FTX US, and served on the Risk and Compliance Committee of FTX US's Board of Directors.

33.     Friedberg's responsibilities included managing risk and overseeing all legal needs for the FTX Group.  As Friedberg confirmed in a recent sworn declaration, he "oversaw all lawyers—as needed—to efficiently deliver legal services to ... Alameda, [FTX] and FTX US."[3]

---

[3]     Friedberg Declaration ¶ 6, ECF No. 198-2, *Garrison v. Bankman-Fried et al.*, No. 1:22-cv-23753 (S.D. Fla. May 11, 2023).

Friedberg was indeed considered one of the key decisionmakers within the FTX Group and each of the Plaintiffs and was routinely identified as a member of the senior executive team.

34.     Friedberg owed fiduciary duties to FTX, FTX US, Alameda, and WRS, which employed him as a high-ranking legal and/or compliance officer.  These fiduciary duties, at a minimum, meant that Friedberg owed duties of care, loyalty, and good faith to those entities.  As part of those broader duties, Friedberg also had a duty to minimize the risk the FTX Group faced from control failures.

35.     Far from being the adult in the room, Friedberg actively embraced the party culture that surrounded certain of the FTX Insiders.  In one instance, while in the Bahamas, Friedberg asked Ryan Salame ("Salame"), head of FTX Digital Markets, several times about the location of psychedelic mushrooms because he could not find them.

36.     As the Chief Legal Officer and the head of compliance, Friedberg was well compensated.  Bankman-Fried offered Friedberg an annual base salary of $300,000, a $1.4 million signing bonus, performance-based annual bonuses, and an 8% equity stake in FTX US.  In addition, Bankman-Fried promised Friedberg "consideration of small portions of equity in futures [sic] ventures" in which Friedberg was significantly involved.  The majority of Friedberg's salary was paid by Alameda, and a small portion was paid by FTX US.

37.     In July 2020, the FTX Group also caused Friedberg to be granted 102,321,128 Serum tokens ("SRM"), a digital currency launched by the Serum Foundation in 2020.  Friedberg did not provide the FTX Group with any consideration for these tokens.

38.     In December 2020, FTX US agreed to redeem Friedberg's 8% equity for a cash payment to Friedberg of $28,695, and made that payment to Friedberg in April 2021.

39.     In June 2021, Friedberg received a $3,007,451.30 cash bonus payment from Alameda (the "2021 Alameda Bonus").

40.     The FTX Debtors are continuing to investigate asset transfers that were not documented or were structured to avoid detection, and reserve the right to amend this pleading to include and avoid any such transfers made to Friedberg.

## III.   FRIEDBERG'S BREACHES OF FIDUCIARY DUTIES AND MISCONDUCT

41.     Friedberg breached his fiduciary duties, aided and abetted others' breaches, committed legal malpractice, and caused corporate waste by:  (a) participating in and aiding and abetting Bankman-Fried's and other FTX Insiders' diversion of funds and fraud; (b) skirting domestic and international regulations; (c)  orchestrating the creation of the Serum Foundation for the benefit of certain FTX Insiders; (d) causing the FTX Group to vastly overpay for bogus "marketing" services by one of Friedberg's acquaintances; (e) directing an $11.5 million investment from the FTX Group into a community bank that was run by a friend of Friedberg and that later failed following action by banking regulators; (f) whitewashing complaints by whistleblowers alleging misuse and commingling of FTX Group assets and other related misconduct; and (g) failing to implement any meaningful oversight, internal controls, or checks at the FTX Group.

### A.     Friedberg Actively Assists in the Diversion of Funds from the FTX Group for the Benefit of the Insiders

#### 1.     Friedberg Directs the Creation of North Dimension, a Vehicle for Commingling and the Looting of FTX Customer Funds

42.     After FTX.com launched in or around April 2019, it needed to establish bank accounts in which its customers could deposit fiat currency for credit to their FTX.com accounts. The funds in these accounts, however, were in fact commingled.  They were ultimately used by FTX Insiders to back highly speculative, unhedged, cryptocurrency trading and fund hundreds of

so-called "venture investments," as well as to make purported personal "loans," bonuses, real estate purchases, and charitable and political contributions.

43.     At that time many U.S. banks were reluctant to do business with cryptocurrency companies, particularly cryptocurrency exchanges.  Bankman-Fried had tried, unsuccessfully, to open a bank account for FTX in or around January 2020.

44.     Friedberg solved this problem by creating a shell entity that concealed the involvement of FTX—North Dimension Inc. ("North Dimension").  Indeed, Bankman-Fried testified that the idea of forming North Dimension was "communicated to [him] by Dan Friedberg."[4]  On August 25, 2020, Friedberg, directed the formation of North Dimension, emailing his former Law Firm-1 colleagues and directing them as follows:

> We need two new subsidiaries asap:
> North Wireless Dimension Inc.
> North Dimension Inc.
>
> Both Delaware corporations
> Owned by Alameda Research LLC
> Disregarded for tax purposes
> . . .

45.     North Dimension was a shell company with no employees, no legitimate business purpose, and no business operations.  A North Dimension website later falsely claimed the company sold electronic goods, and did not disclose North Dimension's close affiliation with Alameda or the FTX Group.

---

[4]  Trial Transcript, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y.) ("Trial Tr."), 2229:2-8.

46.     By creating North Dimension, Friedberg and Bankman-Fried were able to obscure the relationship between FTX.com and Alameda, and circumvent the extensive due diligence and licensing requirements necessary to open a customer deposit account in the name of FTX.com.

47.     In late 2020, North Dimension applied to open an account with Bank-1.  Because North Dimension falsely characterized itself as a trading firm, Bank-1 required North Dimension to complete an Initial Due Diligence Questionnaire for Traders (the "Due Diligence Questionnaire") as part of the application process.  The Due Diligence Questionnaire identified Friedberg as North Dimension's General Counsel and Compliance Officer.

48.     The Due Diligence Questionnaire contained multiple misrepresentations.  For instance, the questionnaire falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account. . . and participates in direct peer-to-peer, OTC purchases and sales with certain third parties for its own account."  Friedberg directed the preparation of this questionnaire and instructed that it be sent to the bank via e-mail on or around December 1, 2020.  Bankman-Fried testified that Friedberg presented him the completed Due Diligence Questionnaire to sign.[5]

49.     In or around April 2021, Bank-1 opened accounts for North Dimension.  The North Dimension bank accounts subsequently received tens of millions of dollars in customer funds intended for the FTX exchange.  Bankman-Fried testified that the fact the North Dimension bank accounts received customer funds was well-known by Friedberg,[6] and far from being safeguarded in any way, these funds were in fact commingled with other FTX Group funds and used to back highly speculative, unhedged, cryptocurrency trading, fund hundreds of so-called "venture

---

[5]  Trial Tr. 2183:24-2184:17.

[6]  Trial Tr. 2239:6-22.

investments," as well as to make purported personal "loans," bonuses, real estate purchases, and charitable and political contributions.

50.     Friedberg knew that North Dimension was being used to fund charitable contributions. He was told that the FTX Group's philanthropy arm needed to "open a new bank account to process gifts" because North Dimension's account was "too sketchy" for some payment processors and the rest of the FTX Group "doesn't feel comfortable with our grant processing team having direct access to ND [North Dimension]."  Employees of the philanthropy arm proposed just adding another layer to the onion:  to get around these issues, "ND would put money into the service LLC and the service LLC would make the gifts."

51.     Through the creation of the North Dimension account, Friedberg, FTX's Chief Compliance Officer, facilitated the FTX Insiders' looting of customer funds from FTX.  He directed the incorporation of North Dimension, directed employees to open its bank accounts, directed misrepresentations to the bank in opening the account, and knew that those accounts were accepting FTX customer deposits[7] and that funds from those accounts were being used to fund charitable donations.

## 2.    Friedberg Devised and Drafted Sham Intercompany Agreements to Conceal Improper Transfers of Customer Funds and Report Inflated Revenue to Investors

52.     In light of a planned Nasdaq initial public offering ("IPO") of FTX, which required an audit, Friedberg realized that the improper commingling and looting of FTX customer funds by Alameda might be uncovered.  To conceal these practices, Friedberg conceived of and ultimately drafted a sham intercompany agreement to be provided to the auditors.

---

[7]  Trial Tr. 2239:6-22.

53.     In an email to Law Firm-1 in January 2021, Friedberg stated that "[s]ome FTX cash and crypto is held by Alameda for the benefit of FTX customers.  As we wade into the audit, the explanation here is important.  We propose a 'cash management' agreement between the affiliates somehow where FTX gets first dibs on Alameda's cash."

54.     In preparing this agreement, Friedberg grew concerned by the possible release of information regarding the inter-woven relationships among the FTX Group entities, which might have shed light on the FTX Insiders' misconduct.  Accordingly, he sent an email to Law Firm-1, asking, "What are the public disclosures that will likely be required with respect to the intercompany relationships between Alameda Group and FTX?  How detailed?"  A Law Firm-1 attorney replied, "Yes, we'll need to disclose of [sic] the material terms of all related party transactions ... ***This could be very problematic*** given that this'd [sic] likely draw in all of our intercompanies, including the FTT docs."  (Emphasis added.)

55.     Law Firm-1 proposed to Friedberg that an "Intercompany Treasury Management and Loan Agreement" be entered into under which Alameda would perform "treasury management functions" for FTX.  Friedberg, however, rejected this approach.  On April 12, 2021 Friedberg crafted a so-called "Payment Agent Agreement."  Pursuant to the Payment Agent Agreement— which Friedberg had Bankman-Fried execute—Alameda agreed to provide "payment services" to FTX, in which it would "complete payments ... as directed by FTX from time to time," and receive assets from FTX "to be held and/or transferred ... as quickly as commercially possible."

56.     To avoid having to disclose that the FTX Group had commingled customer and non-customer funds, the Payment Agent Agreement further provided that "ownership of the any [sic] assets that FTX provides ... shall ***remain in FTX***," and FTX retained "the right to require" repayment.  (Emphasis added.)  Friedberg's colleague specifically asked Friedberg about the

removal of a clause that guaranteed that Alameda would hold assets **on FTX** worth 1.5 times any amount that it borrowed, asking "is there somewhere generic saying that Alameda would maintain sufficient assets to pay the exchange back?"

57.     Document metadata reflects that Friedberg created the earliest draft of the agreement in April 2021, but Friedberg then falsely backdated the Payment Agent Agreement by two years so that the Effective Date was June 1, 2019.  Bankman-Fried signed the document on behalf of both Alameda and FTX on or about April 16, 2021, in ink rather than electronically using DocuSign (as was the typical practice at FTX), to avoid generating an electronic record of the true date of execution.  Bankman-Fried has since confirmed that it was Friedberg who provided him the backdated Payment Agent Agreement for execution.[8]

58.     With no trace of irony, just three days after Friedberg had Bankman-Fried execute the backdated Payment Agent Agreement in wet ink, Friedberg demanded a DocuSign version of a separate document from a paralegal:  "Why isn't this document in docusign format?  Docusign retains a record of the date it is signed?  Where is the docusign information?"

59.     Friedberg then caused the outside auditor to be provided with the false, backdated Payment Agent Agreement.  The auditor then created an audited financial statement of FTX, which FTX subsequently provided to potential investors in connection with its $400 million Series C financing that closed in January 2022.  This audited financial statement did not disclose the true relationship between FTX and Alameda, or the FTX Group's commingling and misuse of customer and non-customer funds.

---

[8]   Trial Tr. 2185:11-2186:16.

60.     Contrary to the Payment Agent Agreement, and the audited financial statement that relied upon it, Alameda was not a payment agent, nor did Alameda merely hold and transfer assets as directed by FTX.  In actuality, FTX customer funds were commingled with non-customer funds.

### 3.     Friedberg Facilitates the Transfer of Billions of Dollars to Certain FTX Insiders

61.     Friedberg also papered over transfers to certain FTX Insiders by falsely characterizing them as personal loans from Alameda.  Over the span of two short years, Friedberg was involved in more than $2 billion in such transfers—purported "loans"—from Alameda to FTX Insiders.  None of these "loans" has ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid.

62.     Friedberg had a duty to act in the best interests of the Plaintiffs, and to ensure that proper safeguards were in place to prevent FTX Insiders from looting the company.  Instead of fulfilling his duties, Friedberg actively participated in the misconduct, aided others' misconduct, and placed the interests of himself and the other FTX Insiders ahead of the Plaintiffs' interests.[9] Friedberg's involvement with the purported "loans" for certain FTX Insiders' enrichment included, but was not limited to:

a.     Editing a promissory note lending tens of millions of dollars to a founder.

b.     Providing detailed instructions, via Signal, for executing hundreds of millions of dollars in founder loans.

c.     Recording hundreds of millions of dollars in *other* loans to founders by simply posting them in a Slack channel.

d.     Confirming details about the founder loans to the FTX Group's accountants.

---

[9] Indeed, in a single month, July 2021, promissory notes signed by Bankman-Fried, Singh, and Wang with Alameda amounted to more than $200 million.

> e.   Discussing founder loans via Zoom with outside counsel and the FTX Group's accountants.

63.   At Bankman-Fried's trial, Wang confirmed that Friedberg "handed" him some of the founder loans.[10]  Wang also noted that he did not talk to Friedberg before signing the loans and did not know why they structured the transactions as loans with promissory notes.[11]

64.   Friedberg also helped Bankman-Fried conceal these founder loans from investors and business partners.  For example, in June 2021, as part of a FTX Series B-1 fundraising round, outside counsel for Investment-Firm-2 (a Singaporean investment company) emailed Bankman-Fried and Friedberg a list of diligence questions and documents to collect.  Among other things, Investment-Firm-2 requested "[a]ny related-party agreements between [] any Group Company and any founder, employee, equity holder or director," specifying that the request "include[d] the following: ***employee loans***."  (Emphasis added.)  On September 5, 2021, Bankman-Fried sent FTX's "final set of responses," copying Friedberg, by providing Investment-Firm-2 with an FTX Group organizational chart.  Bankman-Fried did not disclose any of the "founder loans," which totaled hundreds of millions of dollars at that point in time.  Friedberg, for his part, did nothing to correct the record, despite being aware of these loans.

65.   Because of the size of the loans, Friedberg had an obligation to evaluate the source of funds for these massive transfers, as well as each loan recipient's ability and intent to repay.  But even during the crypto boom, FTX Insiders could not reasonably have repaid all these loans in full, and no reasonable lender would have loaned such large amounts.  Indeed, the FTX Group's

---

[10]   Trial Tr. 577:13-15.

[11]   Trial Tr. 576:5-578:23.

outside accountant raised concerns to FTX Group employees, including Friedberg, that the FTX Insiders were not paying off these loans.

66.     There is no documentation suggesting that at the time these loans were made Friedberg engaged in any discussions about how or when these loans would be repaid or whether the relevant insider had sufficient cash or crypto assets to repay the loan.  Upon information and belief, none of the loans discussed in this First Amended Complaint were ever fully repaid, nor was interest paid on most or all loans.

67.     On information and belief, Friedberg approved and executed each transaction for the sole purpose of the enrichment of certain FTX Insiders.

68.     The Debtors lost billions of dollars as a result of these improper loans, as well as Friedberg's other breaches of duties and misconduct.

69.     Friedberg's conscious, willful, wanton, and malicious conduct exhibits a reckless disregard for the interests of Debtors and their creditors.

**B.      Friedberg Knowingly Skirted Regulations And Made Misrepresentations To Government Bodies**

**1.      Friedberg Skirted Regulations to Facilitate Alameda's Arbitrage Trading**

70.     In Alameda's early days, certain FTX Insiders, including Bankman-Fried, realized that Bitcoin sold for a premium on certain international cryptocurrency exchanges, including in Foreign-Jurisdiction-1.  Accordingly, certain FTX Insiders implemented an arbitrage strategy by buying Bitcoin on other exchanges and then selling it on Foreign-Jurisdiction-1 exchanges. Friedberg (then still at Law-Firm-1) helped advance and advised on this strategy from, or at the very least at around, its inception.

71.     The arbitrage strategy proved a potential gold mine for certain FTX Insiders.  But even this early trading by certain FTX Insiders was rife with deceit:  Many Foreign-Jurisdiction-1

exchanges limited trading to Foreign-Jurisdiction-1 residents and corporations founded in Foreign-Jurisdiction-1. The early FTX Insiders were not Foreign-Jurisdiction-1 residents, and Alameda was not founded in Foreign-Jurisdiction-1.

72.     Nonetheless, Friedberg and Law-Firm-1 helped further a solution, the "Foreign Arbitrage Strategy": Alameda hired a Foreign-Jurisdiction-1 resident (who was not a Foreign-Jurisdiction-1 national) to act as a "nominee entity" and implement the Foreign Arbitrage Strategy on their behalf. In late December 2017, an Alameda employee emailed Law-Firm-1 attorneys Friedberg and his colleagues, copying Joe Bankman (Bankman-Fried's father), and asked Law-Firm-1 to send a "nominee agreement" for Account Holder-1, a resident (but not national) of Foreign-Jurisdiction-1, to act as Alameda's agent and nominee and trade on Foreign-Jurisdiction-1 exchanges on Alameda's behalf.

73.     Account Holder-1 opened an account on a Foreign-Jurisdiction-1 exchange under his own name in or around December 2017. He sold cryptocurrency on behalf of Alameda on the exchange, transferred the funds into his personal bank account, and then sent the funds to Alameda. As explained by Account Holder-1 to Bankman-Fried, Bankman and Friedberg in October 2019, the process was simple: "I let Alameda sign up to cryptocurrency exchanges using my name, address, passport number, etc. So on paper it looks like I conducted transactions there, but it was actually Alameda."

74.     The Foreign Arbitrage Strategy resulted in a windfall for certain FTX Insiders. The arbitrage earned enough money for Account Holder-1 to send Alameda more than $1 million per day. But as Friedberg, Law-Firm-1, and certain FTX Insiders knew, the Foreign Arbitrage Strategy that helped get Alameda off the ground was itself illegal.

75. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

76.     Then, on January 31, 2018, an Alameda employee sent Friedberg a memorandum drafted by a separate law firm stating that Account Holder-1 "may not engage in the Current Model and has been violating the PSA [the Foreign-Jurisdiction-1 Payment Services Act]. *There are criminal punishment for violation of the PSA.   To avoid any accomplice liabilities, we recommend that Alameda should stop the Current Model as soon as possible.*" (Emphasis added.)

77.     On February 4, 2018, Friedberg emailed Bankman-Fried and Bankman that "we are already aware that the nominee relationship creates issues with respect to the exchange/bank terms in both the US and Foreign-Jurisdiction-1.  No need for any firm to write a memo on this.  This is the reason we are uncomfortable with the nominee relationship."  A few days later, Friedberg again acknowledged that the Foreign Arbitrage Strategy had "regulatory concerns" and "[e]veryone is in full agreement to move expeditiously to the new model."  These statements make abundantly clear that Friedberg knew the arbitrage was illegal, but instead of shutting it down, he sought to whitewash his and certain other FTX Insiders' fraud, as he would subsequently do over and over again until, and after, the FTX Group collapsed.

78.     Thus, even after FTX, Law-Firm-1, and Friedberg received the memorandum on the Foreign Arbitrage Strategy's illegality, Account Holder-1 continued trading on behalf of Alameda and certain FTX Insiders for at least two more months, through March 2018.

79.     At the same time, Law-Firm-1 and Friedberg helped certain FTX Insiders conceal the arbitrage from the prying eyes of financial institutions with whom they did business, including Bank-1 and two other cryptocurrency exchanges.  As Account Holder-1 concedes in his October 2019 post-mortem, he lied about the Foreign Arbitrage Strategy to financial institutions:  "phone call with Investment-Firm-1 to pretend that I'm doing the crypto trading.  Because Investment-Firm-1 was calling me and *Alameda didn't want Investment-Firm-1 to know that Alameda were trading with a borrowed name.*"  (Emphasis added).

80.     Friedberg encouraged these misrepresentations.  In November 2018, an Alameda employee told then-Law-Firm-1 attorney Friedberg that a cryptocurrency exchange asked Alameda how its Foreign-Jurisdiction-1 and Foreign-Jurisdiction-2 entities traded cryptocurrency. Friedberg responded: "never mention the nominee entities moving forward."  Also in November 2018, after Bank-1 flagged a deposit that another nominee made to one of Alameda's accounts, Friedberg advised the same Alameda employee not to disclose the Foreign Arbitrage Strategy to banks:  "[t]here shouldn't be any reason to mention the OTC business to banks ever."  In a separate thread, the employee asked Friedberg and other Law-Firm-1 employees "if I should acknowledge the OTC business at all" in discussions with a bank.

81.     Within a few months, the Foreign Arbitrage Strategy fell apart.  In March 2018, Account Holder-1 tried to withdraw approximately $1.3 million dollars from a cryptocurrency exchange.  As discussed in an internal Alameda email chain, when that exchange called Account Holder-1 to confirm the details of his withdrawal, Account Holder-1 inadvertently "mentioned that

he was trading on behalf of a company."  As a result, the exchange "froze the account."  Later, in 2019, Foreign-Jurisdiction-1 tax examiners confronted Account Holder-1, prompting him to write a post-mortem detailing all aspects of the Foreign Arbitrage Strategy.

82.     Despite its illegality and this predictable outcome, Friedberg continued to endorse the Foreign Arbitrage Strategy until at least January 15, 2019, when Friedberg advised Alameda that they could establish a similar approach for "nominee entities" to trade cryptocurrency on another exchange.

### 2.     Friedberg Oversaw Grossly Inadequate Know-Your-Customer Systems

83.     Large financial institutions are vulnerable to fraud, corruption, money laundering, and terrorist financing, and know-your-customer ("KYC") protocols—which the laws of most countries require—seek to prevent those harms by verifying the accuracy of a customer's identity and the legitimacy of a customers' activities and source of funds.  FTX and FTX US each had a KYC program, and Friedberg (as Chief Compliance Officer of the Exchanges) bore responsibility for their implementation.  Rather than designing and enforcing robust KYC programs for FTX and FTX US, Friedberg undermined and flouted them.

84.     As it stands, there are hundreds of millions of dollars-worth of claims in the Chapter 11 Cases that will not be paid out due to issues relating to KYC, fraud, or sanctioned jurisdictions.  These claims accrued under Friedberg's watch and demonstrate the depth of the compliance failures that Friedberg oversaw.

85.     A former compliance executive confirmed that Friedberg undermined her efforts to implement a strong compliance program.  The compliance officer demanded additional screening on red flagged accounts, refusing to open flagged accounts until additional compliance measures had been taken.  She was directed to open the accounts notwithstanding her concerns.  That same

compliance officer raised to Friedberg that effective KYC controls require applicants to translate foreign-language submissions. Friedberg vetoed that suggestion, saying it would "deter just about everyone from signing up."

86.     When KYC issues were elevated to him, Friedberg frequently pushed for a quick solution. For example, in April 2021, Friedberg discussed responses to due diligence questions about KYC with Singh, one of the FTX Group's top engineers. Singh flagged that "[s]ome of these will take some time to get," to which Friedberg replied, "***just type a short answer to each question … It doesnt [sic] matter***." Singh said that some questions "need numbers we'd need to fetch," and Friedberg told him "to just [] estimate 100 or something." And when discussing an account with a $64,000 balance that had been frozen because the associated passport registered as fraudulent, Friedberg proposed to "just call the lawyer [of the account holder] and refund the balance to him?"

87.     Friedberg's approach resulted in woefully deficient KYC programs. As late as July 2022, an FTX Group employee informed Friedberg about "the three accounts on FTX.us I found in sanctioned regions." FTX US decided ***not*** to report those to the Office of Foreign Assets Control ("OFAC"), the U.S. government entity responsible for enforcing sanctions, because "we would not want the scrutiny on our programs because of the gaps we still need to address."

### 3.     Friedberg Attempted to Interfere With KYC Processes To Aid Two Felon Friends and Their Associates in Transferring Obfuscated Money onto the Exchanges

88.     In a particularly egregious example, Friedberg interfered with the FTX Group's KYC processes to help two convicted felons whom Friedberg met while working at an online poker company, which later imploded after becoming embroiled in a cheating scandal (which Friedberg appears to have tried to whitewash). They and their associates later transferred

substantial amounts of money onto the exchanges, and conducted millions of dollars in trades until FTX collapsed.

89.     While serving as Chief Compliance Officer for both FTX and FTX US, Friedberg intervened several times to help two former colleagues, Brent Beckley ("Beckley") and his step-brother Scott Tom ("Tom"), attempt to bypass the KYC system.  Friedberg met Beckley and Tom when he served as general counsel between 2005 and late 2006 for the holding company of UltimateBet.com ("Ultimate Bet").  Ultimate Bet allowed individuals to play online poker games, betting with real money.

90.     Ultimate Bet owed some of its success to a sponsorship with Russell Hamilton, a professional poker player paid to promote Ultimate Bet.  However, in 2008, the Kahnawake Gaming Commission announced that "clear and convincing evidence" showed that Hamilton had used a so-called "God mode" for years, allowing him to cheat by seeing other players' cards.

91.     Per news reports, in May 2013, a former assistant to Hamilton released an explosive three-hour audio tape of a 2008 meeting, during which Hamilton, Friedberg, and others discussed the cheating scandal.  Those present discussed the "God mode" software, and Hamilton admitted to stealing between $16 and $18 million from players using this program, saying, "I did take this money, and I'm not trying to make it right."

92.     Press reports state that Friedberg told all present that, in response to outside inquiries, they should downplay their culpability by saying that a consultant "took advantage of a server flaw by hacking into the client, unable to identify exactly when."  Friedberg also advised trying to minimize the amount refunded to cheated clients, saying, "If we can get it down to 5 [million dollars], I'd be happy."  Ultimately, eleven people were indicted on charges related to the

Ultimate Bet scandal.  Beckley and Tom both pleaded guilty, and by this time had an "adopted home in Antigua" (although they later moved to Costa Rica).

93.     A lawsuit from Friedberg's former romantic and business partner, Erica Lill, corroborates the connection between Beckley, Tom, and Friedberg.  The lawsuit alleges that Friedberg engaged in a pattern of deceptive conduct regarding an investment real estate asset.  The lawsuit contains extensive allegations about Friedberg's relation to Beckley, Tom, and Antigua:

> "Daniel Friedberg is a high power, highly paid securities attorney, that specializes in hiding money in foreign and virtual currencies.  Dan can and has moved money out of country never to be recovered … Earlier this year Dan and I traveled to Antigua, we stayed with his 'best friend' and client, Scott, Dan helped launder and hide more than 7 million dollars in foreign countries.  Dan opened up some bank accounts with an attorney while we were there.  Later we then traveled to Amsterdam [and] I listened to Dan talk about the accounts he opened in Antigua [and] how they are a 'friendly' bank and country.  As I now know Dan draws a very gray line between right and wrong, legal and illegal."[12]

94.     The connection between Tom, Beckley, and Friedberg later proved convenient for Tom and Beckley.  On multiple occasions, Friedberg assisted them in attempting to bypass the FTX Group KYC processes so they and their affiliates could engage in millions of dollars of trades on the exchange.

---

[12]   Response to Summons, Lill One LLC et al. v. Danial Friedburg [sic], Case No. 14-008374-CI (Fl.).  Media reports further corroborate Tom's connection to Antigua.  In 2018, Tom and other business associates had repurposed an oil tanker into a party boat and operated it in Antigua for several years.  https://antiguanewsroom.com/d-boat-moves-to-st-maarten/.  Unfortunately, after a hurricane damaged its mooring, it crashed into the nearby island of Sint Maarten in 2020; its owners apparently abandoned it, and as recently as 2022 it still marred the coastline.  *All Shipwrecks Removed Before Hurricane Season, Except 'D-Boat'*, Daily Herald, June 13, 2022, https://www.thedailyherald.sx/islands/all-shipwrecks-removed-before-hurricane-season-except-d-boat.

95.      Beginning in July 2021, Friedberg intervened to ask FTX's KYC customer service employees to help an entity called Secure Shopping Limited ("Secure Shopping") "get to [a] higher [KYC] tier [because it] is stuck – can someone take a look." Secure Shopping had a history of transfers to Tom and Beckley, and some of its KYC information was plainly falsified.

96.      Secure Shopping, although registered to a Costa Rican individual, was incorporated in Hong Kong. Secure Shopping's KYC application also included a falsified resume that described its registered Costa Rican agent as having over fifteen years of experience in the financial industry (he was in fact an outdoor survival expert with no such experience). The application also attached an account statement showing transfers of over $325,000 to Scott Tom, $130,000 to Brent Beckley, and significant sums to other associates. The account statement was also highly suspicious, as it showed a wire from a nonexistent entity to an LLC registered to the mother of one of Scott Tom's associates. Asked for further information to support its application, Secure Shopping provided a "Marketing Reseller Agreement" with the nonexistent entity which had an effective date ***before Secure Shopping's purported date of incorporation***, as well as an invoice from a U.K. company registered three days before the invoice which took no further corporate action until it dissolved.

97.      Ultimately, even with Friedberg's encouragement, Secure Shopping was unable to make it through FTX's slipshod KYC procedures. But this was not because FTX employees flagged its fraudulent documents (they did not). Rather, it was because Secure Shopping flatly refused to provide basic documentation confirming that it was based in Hong Kong, as it claimed. The fact that Friedberg went out of his way to help such an obviously fraudulent entity speaks volumes about his approach to KYC protocols.

98.      Showing the effort Friedberg undertook in order to help his friends, that same month, Friedberg communicated extensively with a group of Costa Rican phone numbers (based

on country code) that likely correspond to Scott Tom and his associates.  On July 11, 2021, an FTX account in the name of "Scott Tom Beckley" (apparently a mashup of Scott Tom and Beckley's names) was created.  On or about July 12, Friedberg, Scott Tom, and other associates had a group call on Telegram.  The next day, one of them asked Friedberg "When we send payments out, how does FTX show their sending address?"  Friedberg responded, "I'm not sure but I know its readily identifiable as coming from us."  On July 16, one of them "[c]hecked again this morning and we are still a tier 1 [on the KYC tiers]" and explicitly asked Friedberg what to do to "move this forward."

99.    The following month, another Costa Rican individual, Luis Alberto Lopez Valverde attempted to create an FTX trading account for a Costa Rican entity named Panda Marketing Enterprise Sociedad de Responsabilidad Limitada.  It immediately became obvious that "Panda Marketing," like "Secure Shopping," had close ties to Scott Tom.  To begin, Valverde had received payments from Secure Shopping and had connections to an associate of Scott Tom. Valverde also submitted purported invoices for Panda Marketing that were nearly identical to the invoices submitted for Secure Shopping.  Moreover, the phone number for Secure Shopping's registrant matches the phone number provided in an online listing for Athlon Optics, and Panda Marketing's registrant originally registered the domain name for *athlonopticscostarica.com*. Similar to the purported registrant of Secure Shopping, the registrant of Panda Marketing has no professional experience in digital marketing (purportedly Panda Marketing's business); he is instead a lifelong law enforcement and security professional.

100.    Just a day after Valverde attempted to create the Panda Marketing account, someone named Otoniel Leon Ulate attempted to create an FTX trading account for an entity domiciled in Spain named Delta-Ivory (UK) Ltd.  In its KYC documents, Delta-Ivory stated that

it was in the business of "business marketing and technology," but this statement was highly dubious, as Ulate is a bus driver. Ulate then submitted purported invoices for Delta-Ivory that were nearly identical to those submitted by both Secure Shopping and Panda Marketing. Several other documents he submitted appear to be fraudulent as well, including one invoice that billed the same dollar amount, for the same services, on the same date, and coincidentally even had the same invoice number as one provided by Secure Shopping. The invoices also show transfers with associates of Scott Tom. Despite these glaring red flags, this account had millions of dollars in monthly trades on FTX for most of 2022.

101. In September 2021, one of the individuals with a Costa Rican phone number reached out to Friedberg again and said, "We need to get these accounts sorted ASAP for the biz we are really growing and need you here my friend!" The next month, that same person told Friedberg he had over $500,000 in his account and asked, "They don't care about my little account right? … Are there any say thresholds that trigger compliance to start watching me[?]" Friedberg responded, "No."

102. In June 2022, Friedberg again attempted to intervene on behalf of Scott Tom and his associates. Friedberg reached out to Patrick Gruhn, the head of FTX Europe, to see if he could help "a friend … named Scott" "free up his trading." Friedberg provided an email address associated with the account in the name of "Scott Tom Beckley" that used Tom's date of birth and Costa Rica as the location (specifically, "300 meters north of plaza country, San Jose, Costa Rica."). FTX Group KYC documents between April and November 2022 had labeled this account with "high" and "severe" risk scores due to exposure to "sanctions" and "stolen funds." An FTX Group engineer looking into the issue responded that "almost certainly the problem is that his first

login was from a Spanish IP." Despite these red flags, Friedberg nevertheless intervened to help Scott Tom again.

103.    Between Secure Shopping, Panda Marketing, Delta-Ivory, and the account in the name of "Scott Tom Beckley," Friedberg intervened on behalf of accounts which had obviously falsified names, which had obfuscated payments to Scott Tom and his associates (through opaque entities or otherwise), and which submitted obviously falsified KYC documentation. Friedberg owed a duty to the FTX Group to ensure KYC compliance. Instead of fulfilling that duty, he attempted to intervene in the KYC processes for the benefit of two known felon friends and their associates, risking the integrity of the Exchanges and exposing them to potential unlawful activity.

### 4.    Friedberg Directed Misrepresentations To The CFTC

104.    From December 2020 through July 2022, the Commodity Futures Trading Commission ("CFTC") requested and subpoenaed information and documents from FTX regarding KYC processes and the trading activities of FTX, FTX US, and Alameda.

105.    The CFTC requested information and documents from the FTX Group on December 9, 2020. On January 8, 2021, Law-Firm-1 responded with a formal letter. Law-Firm-1's response to the CFTC contained material misrepresentations and omissions, directed by Friedberg.

106.    In preparing its January 8, 2021 response to the CFTC, Law-Firm-1 had asked Friedberg to provide the FTX Group compliance manuals and guidelines so Law-Firm-1 could include direct excerpts from the materials in the letter. Friedberg refused, noting that he wanted to keep the response "fuzzy," and instructed Law-Firm-1 to "avoid [a] discussion on the minimum documents that apply [to the KYC process]," which Friedberg described as "a bit thorny." Law-Firm-1 followed Friedberg's instruction and represented to the CFTC that the FTX Group had a formal KYC and onboarding process for margin trading customers.

107.    The CFTC again requested information and documents from the FTX Group on February 2, 2021.  On April 27, 2021, Law-Firm-1 again responded with a formal letter and that response again contained material misrepresentations and omissions, directed by Friedberg.

108.    In preparing its April 27, 2021 response to the CFTC, Law-Firm-1 informed Friedberg that the CFTC was "very interested in figuring out the relationships between Alameda, FTX [Trading] and FTX.US."  Days before submitting this response, a Law-Firm-1 attorney asked Friedberg how to detail the intercompany relationships.  However, upon information and belief, with Friedberg's knowledge, Law-Firm-1 falsely represented that Alameda, FTX, and FTX US "operate[d] as separate and distinct companies."

109.    On July 29, 2021, the CFTC again requested information and documents from FTX. In this letter, the CFTC pressure tested the representation that Alameda, FTX, and FTX US "operate[d] as separate and distinct companies" by requesting documents showing "FTX's corporation organization, including … [any] legal entity holding an interest in FTX.com."   In response, Friedberg ensured that the relationships between FTX Group entities and Alameda were concealed from the CFTC.

110.    On August 14 and August 15, 2021, Law-Firm-1 attorneys and Friedberg discussed which entities with ownership interests in FTX to disclose on an organizational chart to the CFTC. On August 15, 2021, Friedberg instructed a Law-Firm-1 attorney to remove two Alameda entities (Alameda BVI and Euclid Way Ltd.) from the organizational chart.  An hour later, that attorney wrote to his Law-Firm-1 colleagues, copying Friedberg, Bankman-Fried, and Bankman: "for regulatory reasons [related to CFTC queries], we'd prefer for the Alameda entities not to own any shares of FTX Trading."

111.    The Law-Firm-1 attorney then asked if there was a "non-taxable manner" to transfer FTX shares owned by Euclid Way Ltd. (an Alameda entity) into "a new entity that is of the same ownership (90% Sam, 10% Gary), but outside of the Alameda tax tree."  On September 1, 2021, Paper Bird (another entity owned by Bankman-Fried) acquired Euclid's FTX shares for $2.3 billion through a promissory note from Alameda.  Two days later, the attorney instructed that the CFTC be informed that Euclid was not a shareholder of FTX.  Instead of disclosing Euclid's relationship to FTX at any point, Friedberg directed the omission of any mention of minority stakeholders in FTX to the CFTC.

112.    After the collapse of the FTX Group, the CFTC charged Bankman-Fried, FTX, Alameda, and certain FTX Insiders, with fraud and material misrepresentations.[13]  The CFTC filed amended charges against Ellison and Wang, and in February 2023, charged Singh with aiding and abetting fraudulent activities and misappropriating customer assets.  Ellison, Wang, and Singh have since entered into consent orders as to their liability.[14]

### C.    Friedberg Concealed that the Serum Ecosystem Was Controlled by Certain FTX Insiders

113.    In July 2020, certain FTX Insiders created the Serum Foundation, a purportedly independent and decentralized finance exchange with its own SRM token.  Friedberg and certain other FTX Insiders, however, shared a strong vested interest in propping up SRM's value, because they had a direct stake in SRM.  After setting up the Serum Foundation and minting ten billion SRM tokens, certain FTX Insiders decided that they, as well as FTX Group employees and entities, would purchase or receive as grants billions of SRM tokens.  For example, Wang and Bankman-

---

[13]  *See Commodity Futures Trading Commission v. Bankman-Fried, Ellison, & Wang*, Case No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022); *see also* CFTC Press Release No. 8638-22.

[14]  *See* CFTC Press Release Nos. 8638-22, 8644-22, and 8669-23.

Fried both received well over a billion SRM tokens each and Friedberg received 102,321,118 SRM tokens.

114.    Moreover, as revealed during Bankman-Fried's criminal trial, Alameda held massive amounts of illiquid SRM and maintained enormous loans where it posted illiquid SRM tokens as collateral.[15]  Friedberg and certain other FTX Insiders recognized the need to ensure that SRM was valued highly by the market, while at the same time convincing the market that SRM had inherent value that was entirely unconnected to FTX or the FTX Insiders.  After all, if SRM dropped significantly in market value, it would wreak havoc on Alameda's balance sheet and its ability to repay loans—and on the FTX Insiders' ability to siphon billions of dollars from Alameda's coffers.

115.    Friedberg and certain FTX Insiders thus recognized that SRM's commercial viability rested on the market's perception that SRM was valuable, but that the FTX Group did not control the Serum Foundation.  To meet these twin objectives, certain FTX Insiders established de facto control over the Serum Foundation through Law-Firm-1, which managed the FTX Group's relationship with the Serum Foundation while maintaining the façade that the FTX Group and FTX Insiders had an arm's-length relationship with the Serum Foundation.

116.    Friedberg personally orchestrated the creation of the Serum Foundation.  On July 10, 2020, Friedberg directed a Law-Firm-1 attorney to create a new Panamanian foundation as quickly as possible.  The next day, Friedberg instructed that:  the entity must be a "shelf" company (*i.e.*, not a newly-formed entity), the wire should come from Law-Firm-1 (not the FTX Group), and "***Sam's name should not appear on any documents other than [Lawyer-1's] diligence.***"

---

[15]   Trial Tr. 526:12-527:19, 682:6-22, 1217:3-6.

(Emphasis added).  The Law-Firm-1 attorney immediately contacted a Panamanian law firm, run by Panamanian-Lawyer-1, that Friedberg and Law-Firm-1 had previously used to create questionable offshore companies.  On or around July 14, Law-Firm-1 incorporated the Serum Foundation using Panamanian-Lawyer-1 and in accordance with Friedberg's instructions.

117.    Friedberg and certain other FTX Insiders also created and controlled ancillary entities to prop up the Serum Foundation and SRM's market price.  For example, Friedberg had Law-Firm-1 incorporate a separate entity, the Incentive Ecosystem Foundation, on or around December 3, 2020, to provide incentives including marketing, innovation, and development to promote the SRM token.

118.    ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████

119.    Both the Serum Foundation and Incentive Ecosystem Foundation were ostensibly outside the FTX Group's corporate structure but in fact remained subject to certain FTX Insiders' control.  A conversation between Friedberg and a Law-Firm-1 attorney underscores the extent to which Friedberg sought to conceal the true nature of these relationships.  The Serum Foundation regulations provided for SRM tokens to be "burned" over time, thus reducing supply of SRM and making each token more valuable.  In drafting those regulations, a Law-Firm-1 attorney told Friedberg he was "hoping to characterize the burn as a voluntary agreement ... [but *c]alling it out*

***now could make it apparent that we have a transition period where certain parties have the ability to control the burn***." (Emphasis added.) If it became apparent that the burn could be controlled—even for a short period—by "certain parties" (*i.e.*, certain FTX Insiders), rather than by an automated protocol governed by the Serum Foundation regulations, the market value of SRM would plummet.

120.    In response, Friedberg told the Law-Firm-1 attorney to change the wording to "burn automated by the Protocol," send the regulations to Panamanian-Lawyer-1 in the morning for the Serum Foundation to rubber-stamp, and "walk him through the process." This is how Friedberg and certain other FTX Insiders concealed the "transition period" during which FTX Insiders had "the ability to control the burn," and thus, concealed the fact that certain FTX Insiders controlled the Serum Foundation and Incentive Ecosystem Foundation.

121.    As another example of certain FTX Insiders' de facto control of these entities, when the Incentive Ecosystem Foundation signed a $150,000 per month contract to market the Serum ecosystem and projectserum.com, Friedberg approved and sent that contract to Panamanian-Lawyer-1 for rubber-stamp approval. FTX Group entities paid the monthly fees, even though the Incentive Ecosystem Foundation bore responsibility for payment under the contract. Friedberg continued to edit or manage similar contracts between the Serum Foundation or Incentive Ecosystem Foundation well into 2022.

122.    The FTX Group also had the ability to transfer SRM secretly from the Serum Foundation and Incentive Ecosystem Foundation. (An employee once told Friedberg that they were going to transfer SRM from a purportedly independent and decentralized entity, but "because [it] is decentralized, ***we can't just say that we will do it.*** So instead we want to use some language like 'Alameda will support a … grant proposal of 1M SRM … or something like that.") The FTX

Group may have even had the ability to transfer control of "locked" SRM tokens, which were not supposed to be able to move between accounts.

123.    Finally, the FTX Group sent its handpicked employees to staff the Serum Foundation and Incentive Ecosystem Foundation.  Indeed, outside reporting has since confirmed that FTX Group employees held the credentials allowing coders to make changes to the Serum ecosystem.[16]

124.    As was revealed at Bankman-Fried's trial, Friedberg went even further and used the control certain FTX Insiders maintained over the Serum Foundation and the Incentive Ecosystem Foundation to help them report fraudulently inflated revenue to investors.  Singh testified that Bankman-Fried directed him to enter backdated fees from SRM "staking" rewards into the FTX database.  The Serum ecosystem set aside a pool of assets to reward FTX customers for "staking" SRM (that is, not trading it); these fees were purportedly just a 25% cut of those rewards.  The fees were transferred in quick succession from the staking reward pool to FTX's revenue account at or around the end of 2021, not monthly throughout 2021.  These fees then appeared in the FTX database as monthly payments earned by FTX in 2021, so that FTX could report over $1 billion in revenues for the year.  These revenue numbers, inflated with the fraudulent "staking" fees, appeared in financial documents in data rooms to which FTX investors had access.

125.    No contemporaneous contract, however, supported the staking fees, which were purportedly paid monthly throughout 2021.  Instead, in or around March 2022, shortly after auditors asked FTX employees about the deal, Friedberg drafted a "Rewards Agent Agreement"

---

[16]   Shane Shifflett, Rob Barry, & Coulter Jones, *FTX Effort to Save Itself Failed on Questionable Assets*, Wall St. J. (Dec. 5, 2022), https://www.wsj.com/articles/ftx-effort-to-save-itself-failed-on-questionable-assets-11670245668.

for FTX (backdated to January 1, 2021) that provided for the exact "staking" fees about which Singh testified.

126.    The Rewards Agent Agreement also falsely stated that the Incentive Ecosystem Foundation paid the "staking" fees on a monthly basis throughout 2021.  But as noted, the Incentive Ecosystem Foundation was incorporated at Friedberg's direction, and in connection with the Serum ecosystem and SRM token.  The FTX Group at all times maintained de facto control over the Incentive Ecosystem Foundation.   Thus, Friedberg knew that the Incentive Ecosystem Foundation did not actually pay these "staking" fees on a monthly basis at the time that he drafted the Rewards Agent Agreement.  Nonetheless, Friedberg drafted and backdated it anyway in order to give the false appearance that the FTX Group had greater monthly revenues than it actually did.

   D.    **Friedberg Caused the FTX Group to Overpay an Acquaintance Millions in Commingled Funds For "Marketing"**

127.    To keep their fraudulent scheme from collapsing, the FTX Insiders deliberately siphoned billions of dollars of customer funds deposited for use on FTX Trading's and FTX US's cryptocurrency exchanges—FTX.com and FTX.US—which they used to make reckless bets on cryptocurrencies and highly speculative venture investments, finance their lavish lifestyles, woo business prospects and political allies, and line their own and their families' and friends' pockets.

128.    The FTX Insiders treated customer funds deposited on the Exchanges as their own personal piggy bank and treasury, a constant stream of capital to be used to shore up their house of cards from collapse and fund their seemingly insatiable aggrandizement.  To lure customers into depositing more funds with FTX, and to attract new customers and deposits to the FTX.com and FTX.US exchanges, ensuring an ongoing stream of capital, certain FTX Insiders pursued aggressive marketing campaigns.  The more splashy promotions—Super Bowl ads, celebrity

endorsements, and naming rights to the Miami Heat's arena—have already received substantial attention in court filings and the press.[17]

129.    In addition to this wide scale "brand marketing," certain FTX Insiders also aggressively pursued "performance marketing" (a/k/a retail marketing)[18], which "specifically focused on bringing revenue to the FTX platform" by attracting customer deposits and thereby securing new funds that could be improperly siphoned.

130.    Certain FTX Insiders were interested in performance marketing as early as June 2020.  For example, on June 8, 2020, Bankman-Fried wrote: "I don't know how to do retail marketing! This post is an exercise in *pretending* that I do ... Right now we mostly advertise to crypto traders, but a lot of what we offer is really revolutionary outside of the space.  Instant deposits/withdrawals?  5 minutes to create an account and start trading?  100x leverage? . . . Ads/SEO—who wants to own this?"

131.    Certain FTX Insiders began pursuing performance marketing in earnest by April 2021.  As a senior Blockfolio employee wrote in an internal document around that time: "Paid and performance marketing are going to be a pillar of our FTX marketing across brands. . . Given the

---

[17]    *See, e.g.*, Steven Zeitchik and Julian Mark, *FTX Investors Sue Samuel Bankman-Fried and Celebrity Endorsers*, The Washington Post (Nov. 16, 2022), *https://www.washingtonpost.com/business/2022/11/16/ftx-class-action-lawsuit/;* Stacy Elliott, FTX Is Spending Big on Marketing Because 'We're Behind on Name Recognition': CEO, Decrypt Nov. 10, 2021), https://decrypt.co/85744/ftx-is-spending-big-on-marketing-because-were-behind-on-name-recognition-ceo).

[18]    Performance marketing is an umbrella term to describe a digital marketing campaign strategy that is data and result-driven. Advertisers typically pay only when certain outcomes are achieved (e.g., clicks, leads, or sales).  A performance marketing campaign can be implemented using, for example, search engine marketing and optimization, social media, and paid ads.

speed at which FTX moves, it makes sense to hire or acquire that specialized expertise so we can go from 0-60 in this area."

132.    About six months later, on or about October 2, 2021, Friedberg introduced Marketer-1 to Bankman-Fried.  Marketer-1 describes himself as a New York Times bestselling author, a "top influencer" according to the Wall Street Journal, and "one of the top 10 marketers" by Forbes.  According to Marketer-1, he had "known Dan [Friedberg] for years and [Dan] has helped [Marketer-1] in the past," apparently dating back to Friedberg's tenure as a partner at his prior law firm, when he acted as Marketer-1's attorney.  Certain FTX Insiders enlisted Marketer-1 a few weeks after this introduction.

133.    A few weeks after introducing Marketer-1 to Bankman-Fried, Friedberg informed an FTX US employee and a top FTX executive that Marketer-1 had accepted a position as Marketing Manager for Blockfolio, and directed that Marketer-1 would receive a "$75k per month salary."  In addition to this $900,000 annual salary, Friedberg also directed that Marketer-1 receive an option to purchase 100,000 FTX shares, an option to purchase two million SRM tokens, and an option to purchase 5,000 FTX US shares.

134.    Upon information and belief, Bankman-Fried, Friedberg, and Marketer-1 papered several separate agreements for duplicative and exaggerated services with no intention for the services to be provided.  Indeed, most of the services described in the agreements appear to have never been provided, or at least significantly narrowed by August 2022, as detailed below, but Marketer-1 and companies related to him still pocketed tens of millions of dollars.

135.    Marketer-1 himself foreshadowed the snake oil he was selling.  In describing how companies should select a digital marketing agency, Marketer-1 remarked:



As detailed below, Marketer-1 described his *modus operandi* perfectly.

136.     Just days after the FTX Group hired Marketer-1, the FTX Group and Marketing Firm-1 (an entity that Marketer-1 likely receives profits from) executed two contracts regarding search engine optimization and paid media campaigns.  These contracts had a large number of deliverables for a three-year term in exchange for a $7 million payment (and $6 million annually thereafter) and a high percentage of paid media as fees.

137.     One might have expected that Marketing Firm-1 would provide above-market work for exorbitant above-market fees.  Not so.  FTX Group employees began voicing dissatisfaction with Marketing Firm-1's work only months into the engagement.   Blockfolio's Director of Marketing complained that "[n]one of the engagement posts are good," while another FTX Group employee observed that "basic elements of writing such as sentence structure, grammar or spelling were not met."  FTX US's Associate General Counsel internally noted that, when reviewing Marketing Firm-1 drafts of customer newsletters, her comments went beyond just legal review into basic writing feedback and that she got "used to doing that with [Marketing Firm-1] because they were sooo sloppy."  The FTX Group ultimately terminated the scope of services to be provided by Marketing Firm-1.

138.     Not put off by Marketing Firm-1's poor performance, Friedberg and Marketing-Firm-2 (another entity that Marketer-1 likely receives profits from) executed another marketing

---

19

agreement.   Marketer-1 sent Friedberg a draft of this agreement on January 3, 2022.   The agreements were executed just two days later, on January 5, 2022, effective January 1, 2022.   The agreements—a Master Services Agreement and Statement of Work (collectively, the "Marketing Firm-2 Agreement")—describe Marketing Firm-2's responsibility in just two vague lines:  "Over the course of the Agreement, Marketing Firm-2 will find a 3rd party consultant and work with them to either become an affiliate or find ways to promote FTX."

139.    The same day the Marketing Firm-2 Agreement was executed, Marketer-1 e-mailed Friedberg an invoice for $14.8 million.   The invoice described the services in one word: "Marketing."   Three minutes later, Friedberg sent the executed Marketing Firm-2 Agreement and invoice to a private Slack channel with Bankman-Fried and the former FTX chief of staff, with the following message:

> "[Marketer-1] is helping us improve reputation management through a third party.  Could you pay this on behalf of [FTX]?  ***This is not [Marketer-1's] compensation.  Let's not post this to public channel please.***"

(Emphasis added).  Bankman-Fried and FTX's former chief of staff acknowledged the message. Despite Friedberg's characterization, however, this invoice *was* compensation for Marketer-1, by way of Marketer-1's thinly veiled limited liability curtain.

140.    On January 10, 2022, Marketing Firm-2 received a wire transfer of $14.8 million from an FTX account, which contained commingled funds.  In other words, FTX Trading paid $14.8 million to Marketing Firm-2, an entity owned by Marketer-1, in return for nothing more than Marketing Firm-2's agreement to find another consultant.  And if this were not absurd enough, Marketing Firm-2 never actually identified the consultant.

141.    The Marketing Firm-2 Agreement conferred no benefit on FTX Trading, was an egregious waste of corporate assets, and appears to have been nothing other than a mechanism to enrich Marketer-1, who was already on the FTX Group's payroll.

142.    Just days after executing the Marketing Firm-2 Agreement, on January 13, 2022, Marketer-1 sent Friedberg draft agreements for "the 2 projects we talked about over the weekend. FTT and SRM. ... MSA is the old ones that we previously used." Soon thereafter, Marketing Firm-1 executed two agreements (the "Serum Agreements"):  one with Debtor Cottonwood, and the other with non-Debtor Incentive Ecosystem Foundation ("IEF").  As described above, IEF was under the de facto control of certain FTX Insiders and was set up by Friedberg to provide incentives to promote the SRM token, including marketing, innovation, and development.

143.    Each Serum Agreement provides that Marketing Firm-1 and Cottonwood and IEF, respectively, agreed to increase organic website traffic and conversions to projectserum.com using Search Engine Optimization techniques.  In exchange, Cottonwood and IEF would each pay Marketing Firm-1 an annual management fee of $1.8 million in equal monthly installments of $150,000, for a total of $300,000 per month.

144.    Moreover, despite the Incentive Ecosystem Foundation assuming payment responsibility, the Debtors have found evidence that Alameda, FTX, and/or FTX US made its payments.  Upon information and belief, Alameda, FTX Trading, and FTX US transferred approximately $2.7 million to Marketing Firm-1 under the Serum Agreements.  Although Marketing Firm-1 received transfers totaling $600,000 from Cottonwood accounts under the Cottonwood-Marketing Firm-1 Agreement, Plaintiffs have traced the original source of these funds to Alameda.  The remaining $2.1 million paid to Marketing Firm-1 came from accounts that contained commingled customer funds.

145.    Plaintiffs have been unable to identify any deliverables provided by Marketing Firm-1 under the Serum Agreements, even though it was paid at least $2.7 million.

146.    All told, certain FTX Insiders caused the FTX Group to engage Marketing Firm-2 and Marketing Firm-1—entities that Marketer-1 owns or co-founded and has a substantial financial interest in—ultimately paying them at least $30.8 million for duplicative, sub-par, and often non-existent services.  In pushing these wasteful deals through, Friedberg again prioritized the interests of his friends over the interests of the FTX Group, to which he owed fiduciary duties.

### E.    Friedberg Caused the FTX Group to Waste Millions of Dollars on an Investment in a Bank Which the Federal Reserve Later Shut Down

147.    Friedberg similarly directed the overpayment of millions of dollars from the FTX Group to another friend, Jean Chalopin, in early 2022, investing $11.5 million into the holding company for a bank with a single branch that was later forced out of business, potentially rendering the FTX Group's investment worthless.

148.    Beginning in late 2021, Friedberg became personally and professionally close with Jean Chalopin, the Chairman of Deltec bank and co-creator of the Inspector Gadget animated TV show.   They met several times in Seattle and in the Bahamas, and Chalopin made several introductions to key contacts in the Bahamas.

149.    Knowing it might be helpful to have a bank owe them favors, the FTX Group "loaned" Deltec $50 million when Deltec had issues meetings its regulatory capital in October 2021.  The FTX Group originally planned to have Alameda extend the loan, but a group of FTX Insiders and lawyers expressed that they had another Antiguan entity "that would be better that if the news ever did leak wouldn't be so damaging," to which Friedberg responded "Yes – I heard this."  Instead, the loan documents show that Alameda "loaned" Ryan Salame $50 million for "Norton Hall" (the name of the Antiguan entity, which was entirely owned by Bankman-Fried)

and Norton Hall, in turn, "loaned" Deltec $50 million.  In reality, because Norton Hall did not have a bank account, Alameda just transferred $50 million in cryptocurrency from its FTX account to Deltec's FTX account.  Friedberg directed this process, which resulted in Deltec getting enough regulatory capital and the FTX Insiders getting a bank that secretly owed them.

150.    Around the same time, in August 2021, Friedberg and Chalopin started discussing an investment by the FTX Group into FBH Corporation, the holding company of Farmington State Bank ("Farmington").  At the time, Farmington operated as a single-branch bank and crucial community lender to the small agricultural town of Farmington, Washington.

151.    Chalopin formed FBH Corporation and orchestrated its acquisition of Farmington in late 2020.  The Federal Reserve Board and the relevant Washington state supervisor imposed certain conditions on FBH's formation and acquisition of Farmington.  The Federal Reserve required notice if FBH changed its business plan or engaged in digital bank servicing operations on behalf of Farmington.  The state supervisor required, for a period of three years, prior written regulatory approval for changes in senior management, changes in the business plan, and significant forays into digital banking operations.

152.    In late January 2022, Friedberg directed Alameda Research Ventures LLC to pay $11.5 million for 110,000 shares (or 11%) of FBH Corporation, the holding company for Farmington.  Media reports state that this investment (for 11% of the shares) was more than double Farmington's entire net worth as a bank.  This was an astronomical valuation for a small community bank with relatively few assets.

153.    After the investment, Farmington rebranded itself as Geniome Bank, and then quickly rebranded again to Moonstone Bank.  Within months, it touted "significant progress … on becoming the only full chartered bank dedicated to offering a wide array of financial services to

specialty industries," including cryptocurrencies, banking-as-a-service, and cannabis. This new focus was likely a response to FTX's investment. It also meant that Moonstone's success depended on its ability to offer online banking to its customers, which in turn required prior written approval of the Federal Reserve and its state supervisor due to the conditions they imposed on FBH's acquisition of Farmington.

154. However, Moonstone never realized these ambitious plans. On January 4, 2023, federal prosecutors seized $50 million from a Moonstone bank account of an FTX Group affiliate in connection with the indictment of Bankman-Fried. Seeing the writing on the wall, Moonstone closed crypto client bank accounts within weeks, stating that it was "returning to its original mission as a community bank and is discontinuing its pursuit of an innovation-driven business model to develop banking services for industries such as crypto assets." It rebranded back to Farmington.

155. On May 12, 2023, Farmington and FBH entered an agreement to sell all of Farmington's deposits and assets to the Bank of Eastern Oregon, presumably at a fire-sale price.

156. On August 17, 2023, the Federal Reserve Board announced an enforcement action against Farmington and its holding company FBH Corporation. The enforcement action provided for Farmington's operations to wind down and prohibited Farmington or FBH "from making dividends or capital distributions, dissipating cash assets, and engaging in certain activities without approval from its supervisors."

157. Key to the Federal Reserve's drastic enforcement action was a finding that Farmington violated its commitments to the Federal Reserve and state supervisor "by engaging in activities which changed the Bank's business plan and general character without receiving prior

written approval." Farmington violated this commitment by, among other things, shifting to a focus in online banking and taking material steps to facilitate cryptocurrency offerings.

158. As a result, the FTX Group's $11.5 million dollar investment has been rendered worthless, or, at a minimum, has lost a significant amount of its value.

F.     **Friedberg, Bankman-Fried's "Fixer," Whitewashes Complaints of Whistleblowers**

159. For multiple whistleblower complaints alleging corporate malfeasance, Friedberg served as Bankman-Fried's fixer. He explicitly told outside counsel, "I'm in charge of all settlements." He not only settled the complaints for inflated amounts, but also in some instances arranged for the FTX Group to retain the whistleblowers' attorneys post-settlement, thereby buying or otherwise ensuring their silence.

160. Friedberg even concealed the resolution of some of these complaints internally. For one settlement, he told outside counsel that "normally we send all bills to – billing@ftx.com and billing@alameda-research.com and billing@ftx.us depending on which company … but on these large obscene payouts, i keep off those shared addresses – i'll just intro you to appropriate paying person so we can make sure it gets there."

1.     **Friedberg Whitewashes the Bitcoin Manipulation Complaint**

161. On November 2, 2019, Bitcoin Manipulation Abatement LLC, represented by Pavel Pogodin, filed a lawsuit against FTX, Alameda, Alameda Research Ltd. (BVI) and certain FTX Insiders, including Bankman-Fried, Ellison, Wang, and others.

162. The complaint alleged the defendants engaged in cryptocurrency price manipulation through pump and dump schemes, money laundering, operating an unlicensed money transmitter business, unfair business practices, and violations of the Commodity Exchange Act.

163.    Friedberg knew about Pogodin's whistleblower complaint from the day Bankman-Fried received a draft.  On September 23, 2019, Bankman-Fried forwarded Pogodin's email and the draft complaint to Friedberg, a Law-Firm-1 partner at the time, copying Bankman.  Friedberg immediately assured Bankman-Fried that Law-Firm-1's "litigation team [was] reviewing" and looped in Law-Firm-1 litigators to work on the matter and protect the FTX Insiders.

164.    Law-Firm-1 and Friedberg provided advice on how to suppress Pogodin's whistleblower complaint, without ever investigating the factual accuracy of Pogodin's claims. Between September and November 2019, Law-Firm-1 corresponded with Pogodin and advised Bankman-Fried and Bankman about settlement.  On October 4, 2019, a Law-Firm-1 partner counseled Bankman-Fried and Bankman, copying Friedberg, that "nothing will stop [Pogodin] from finding a new plaintiff to bring this same exact suit -it's not legal for us to require [Pogodin] as a lawyer not to bring the same or similar claims with a new plaintiff against you."  On November 2, 2019, Pogodin filed his complaint.

165.    Weeks after it was filed, the lawsuit was settled.  Friedberg, while then serving as the FTX Group's outside counsel, flew out to meet Pogodin and personally negotiated the settlement.  The settlement was accompanied by a side agreement which included significant and unconventional compensation to the opposing firm's lead lawyer, Pogodin.  The side agreement, signed by Bankman-Fried, an FTX Group entity wholly-owned by Bankman-Fried, Cedar Grove Technology Services Ltd., extended to Pogodin a $1 million personal loan and a $200,000 cash payment.  In addition, FTX agreed to "retain" Pogodin for two years for a monthly fee of $10,000. Friedberg thus accomplished precisely what the other Law-Firm-1 partner had previously warned was "not legal"—"requir[ing] [Pogodin] as a lawyer not to bring the same or similar claims with a new plaintiff against [FTX Group entities]."

166.    Subsequently, Friedberg stood idly by as a Law-Firm-1 attorney failed to disclose the payoff to FTX investors.  In December 2019, Law-Firm-1 began compiling documents in an online data room to share with potential FTX investors.  On December 31, 2019, a Law-Firm-1 attorney emailed Bankman-Fried, copying Friedberg, and wrote "[Plaintiffs Attorney-1] Settlement Documents:  We are not including these in the data room, but can provide to investors if asked/or if the deal progresses."  Bankman-Fried replied, "sounds good."

167.    Friedberg also actively concealed this illegal payoff in the FTX Group's acquisition of Blockfolio.  On August 4, 2020, a Law-Firm-1 attorney emailed Friedberg, who had now transitioned to lead in-house counsel for the FTX Group and various FTX Insiders, a draft response to supplemental diligence requests from Blockfolio.  That draft disclosed that Pogodin was an FTX service provider.  The following day, Friedberg replied to Law-Firm-1 attorney, copying other Law-Firm-1 attorneys.  Friedberg warned "Don't mention [Pogodin]," and attached his edits to the draft response, which deleted all references to Pogodin.

168.    When several investors requested that FTX disclose settlement agreements while conducting legal due diligence before investing, Friedberg responded by again concealing the Pogodin payoff.  For example, on July 19, 2021, counsel for a private equity firm asked Friedberg and Law-Firm-1 attorneys for FTX's settlement with Pogodin and related documentation in connection with a Series B investment in FTX.  The same day, Friedberg falsely responded: "THE SETTLEMENT AGREEMENT IS CONFIDENTIAL. NO OBLIGATIONS REMAIN ON THE PART OF FTX."  In fact, FTX was still paying Pogodin $10,000 per month under the settlement agreement and side agreement.

169.    After the monthly payments to Pogodin expired in January 2022, Pogodin sent Friedberg a letter threatening the possibility of additional adverse action against FTX.  Prompted

again to buy Pogodin's silence, Friedberg orchestrated a new engagement letter and agreed to pay Pogodin a lump sum of $1.6 million, as well as $50,000 on a monthly basis.

170.    In sum, Friedberg arranged for the FTX Group to pay Pogodin $3,320,000 through July 2022.  Upon information and belief, Pogodin provided no actual legal services to the FTX Group after signing the engagement letter.

171.    Far from investigating these claims and seeking to remediate any issues identified by that investigation, either before or after becoming an officer of multiple FTX Group entities and a senior legal officer of FTX US and Alameda, Friedberg "fixed" the problem by buying opposing counsel's silence.  In his roles as General Counsel for Alameda and Chief Regulatory Officer of FTX US, Friedberg had a duty to investigate these claims and to remediate any issues identified as a result.  He did not do so.

## 2.    Friedberg Covers Up a Market Manipulation Complaint

172.    In December 2021, following her termination, an FTX US employee ("Whistleblower-1"), sent a demand letter raising serious allegations about the FTX Group.  She alleged (1) "that Alameda [was] nothing more than an extension of FTX, used to bolster investor confidence in FTX projects, and in turn drive up the prices of projects FTX had developed or invested in itself," a form of illegal market manipulation, and (2) that "details regarding company fundraising and various projects were disclosed openly" and on Slack channels which allowed "all employees present to make trades on the information prior to public announcements," a form of insider trading.

173.    Although Whistleblower-1's complaint was addressed to the then General Counsel of FTX US, Friedberg directly inserted himself into and subsequently drove the settlement discussions.

174.   In March 2022, Whistleblower-1 received an extraordinary settlement of ██ ████, even though she had worked at FTX US for less than two months at an annual salary of $200,000.

175.   Although Whistleblower-1 had been an employee of FTX US, Friedberg caused Alameda—not FTX US—to enter into the settlement agreement with Whistleblower-1 and pay the funds to Whistleblower-1.

176.   In his roles as General Counsel for Alameda and Chief Regulatory Officer of FTX US, Friedberg had a duty to investigate these claims and to remediate any issues identified as a result.   However, instead of investigating Whistleblower-1's claims, Friedberg instead bought Whistleblower-1's silence by paying her exorbitant hush money.

177.   Friedberg not only bought Whistleblower-1's silence with an extraordinary settlement payment, he also bought off Whistleblower-1's lawyers in the same manner that he had previously "fixed" the allegations raised by Pogodin.

178.   Shortly after Whistleblower-1's settlement was executed, Friedberg reached out to Whistleblower-1's law firm to discuss the FTX Group retaining the law firm.  Although by that time the FTX Group had no genuine need to retain Whistleblower-1's lawyers, Friedberg sought to buy them off.

179.   In April 2022, approximately one month after executing the Whistleblower-1 settlement, Friedberg and Whistleblower-1's attorneys signed an agreement for "general client counseling" at a cost of more than $200,000 per month for five years—a $12 million commitment. In doing so, Friedberg ensured Whistleblower-1's attorneys' silence.

180.   In the six months following execution of the retention agreement with Whistleblower-1's attorneys, the law firm produced only one piece of work product for FTX:  a

three-page memo with recommendations for FTX US's customer onboarding process, drafted and signed by the law firm's Chief Operating Officer, who did not practice law and never attended law school.

### 3. Friedberg Fires and Buys Off a Whistleblower Who Raised Concerns About Governance and Regulatory Issues

181.    In December 2021, an individual ("Whistleblower-2") was hired as the senior legal officer of Alameda at the FTX Group.

182.    During his brief tenure at Alameda, Whistleblower-2 became concerned about governance and regulatory issues within the FTX Group.  He began his investigation due to the concerning lack of corporate records and became particularly concerned upon learning that Alameda-affiliated entities—including North Dimension—disbursed funds to FTX customers, and began asking questions about why Alameda—a proprietary trading firm—was involved in handling FTX customer funds at the same time it was a major trader on the FTX exchange.

183.    Friedberg then asked to meet with Whistleblower-2 in person, and subsequently terminated Whistleblower-2.  Upon his termination, Whistleblower-2 received a ███████ severance package, even though Whistleblower-2 had worked at Alameda for less than three months.  In a separation email to Friedberg, he wrote, "I do sincerely hope you and SBF act urgently to implement meaningful reforms, especially for the most pressing issues — best to start by turning to [outside counsel] but you would have to tell them the whole truth to let them really help."

184.    Again, Friedberg had a duty to investigate concerns raised by Whistleblower-2, who was hired as the senior legal officer of Alameda.  Instead of conducting an investigation and remediating any issues identified thereby, Friedberg terminated Whistleblower-2.

### G.   Friedberg Fails to Implement Effective Oversight, Internal Controls, and Checks

185.   Friedberg, as General Counsel and Chief Compliance/Regulatory Officer, was responsible for ensuring that proper safeguards were in place to prevent fraud and other wrongdoing.   Friedberg wholly failed in carrying out these responsibilities.   Rather than implementing appropriate internal controls and checks that would prevent fraud and other wrongdoing, Friedberg actively participated in and facilitated such misconduct.

186.   The FTX Group had a handful of employees (the FTX Insiders and their key associates) with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers.[20]  Rather than implementing checks and internal controls to stop these individuals from using this power for wrongdoing, Friedberg enabled them, and himself, to wield this power indiscriminately.   Similarly, Friedberg assisted Scott Tom and his associates in attempting to bypass KYC processes.

187.   Friedberg also failed to establish or maintain any semblance of fundamental financial and accounting controls.   This is particularly shocking given that at its peak, the FTX Group operated in 250 jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users.

188.   Board oversight was effectively non-existent.   As one example of corporate governance (or lack thereof) at the FTX Group, an FTX Group employee wrote to Friedberg in December 2021 that "I am proposing that we create an FTX US Senior Management Committee.

---

[20]   The other such employees have since pleaded guilty or been convicted of fraud and other criminal activity in connection with the FTX Group.  *See infra* ¶¶ 219-25.

– the name doesn't really matter.  I want to stress this is just a box ticking exercise to demonstrate governance and oversight …. Sam and Nishad will be invited but wouldn't need to attend as i could create a slack channel, circulate the agenda and any relevant materials, to which the [sic] could send their apologies and provide and [sic] comments which could be documented in the minutes."  Friedberg should have ensured and facilitated effective board oversight as the FTX Group's top lawyer, but he encouraged the exact opposite.

189.    With few exceptions, the FTX Group lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership. Nor was there any effective internal audit function.  Some FTX Group entities did not produce any financial statements.  Some were deemed impossible to audit.  As Bankman-Fried explained in April 2021, while Friedberg was General Counsel of Alameda:

> Alameda is unauditable.  I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history.  We sometimes find $50m of assets lying around that we lost track of; such is life.  It is hilariously beyond any threshold of any auditor being able to even get partially through an audit."  This is for a number of reasons, many consequences of (a). It is, often, imperative that Alameda be able to operate discreetly; the threshold for giving external disclosure is quite high.

190.    In one particularly egregious example, after an FTX US lawyer informed Friedberg they needed an updated IT audit for submissions to state regulators, Friedberg said "Make sure to tell them ***we just want the date [of the IT audit] updated***," meaning they should ask the auditor just to update the date without conducting any further analysis.

191.    Those entities that did produce financial statements used QuickBooks, Google documents, Slack communications, Excel spreadsheets, and other inadequate means for measuring the level of assets and liabilities held by the FTX Group.  Entries in QuickBooks were often made

months after transactions occurred, rendering real-time financial reporting and risk management impossible.

192.     Even when records were made, many were facially inconsistent, entered in batches, or difficult (or impossible) to reconcile with other documentation.  Many such records were also inconsistent with the apparent purpose of the transfers.  For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022.  These transfers were documented in promissory notes as purported loans from Alameda to Bankman-Fried but recorded on the ledger as "Investment in Subsidiaries: Investments-Cryptocurrency."

193.     For transactions recorded in the QuickBooks general ledger that involved digital assets, the ledger often did not record the identity or value of these digital assets and often grouped them in batch entries.  Many of the intercompany transactions were recorded this way, resulting in accounting records showing colossal intercompany loans across FTX Group entities that are difficult to reconcile with underlying documentation and omit crucial information regarding the source and identity of the digital assets involved.

194.     The extent of these control failures was exemplified when FTX sought to conduct an IPO in early 2021.  Because an IPO would require the preparation of audited financial statements for FTX, Friedberg scrambled to cobble together purported policies and procedures that could be shown to auditors.

195.     Policies were, accordingly, drafted by editing off-the-shelf templates provided by FTX Group's outside accountants, Robert Lee & Associates.  Plaintiffs have found no evidence that employees were ever trained on these policies.

196.   Friedberg, as a top legal and compliance officer for Alameda, FTX, WRS, and FTX US, had a duty to implement adequate internal controls, address the control failures and deficiencies, and mitigate the damage they caused to the companies.  Friedberg knowingly failed to do so and therefore breached his duties and assisted others in breaching theirs.

197.   Friedberg also kept important legal matters to himself, limiting other FTX employees' visibility into such issues.  For example, he once told the head of listing for FTX US, "For the legal opinion you are getting from the US, don't post this to slack or share this with anyone other than me."

198.   Friedberg also used Signal, an encrypted messaging application, frequently set to auto-delete sent and received messages, to detail how to execute transfers in the hundreds of millions of dollars to enrich FTX Insiders and directed discussions around sensitive topics or entities to Signal (instead of e-mail, which creates a record).  Friedberg thus encouraged a company culture wherein important details and discussions were hashed out on Signal, preventing accurate record keeping or accountability.

199.   Indeed, many colleagues recognized that Friedberg, often unreachable via email, would be very responsive on Signal.  Friedberg often sought and received substantive legal advice on Signal.  Friedberg once wrote to another FTX US lawyer that they "generally use signal threads rather than email *for all internal items*."

200.   For example, on May 6, 2022, Friedberg directed the following "round trip" transactional maneuver via Signal:

   a.   *First*, $316 million and $35 million was sent from Alameda to Bankman-Fried's and Wang's personal ftx.com accounts, respectively, as "founder loans."

   b.   *Second*, Friedberg instructed that the same amount be transferred as "capital contribution[s]" from those personal accounts to

emergent@placeholder.com, noting "that this Emergent account is just a placeholder – funds should never stay in there."

c.    *Third*, Friedberg instructed the same amount should be transferred from emergent@placeholder.com back to Alameda Research Ltd. as a "stock purchase."

d.    As Friedberg explained, "it is just a round trip - from AR to Sam/Gary to Emergent back to AR Ltd."

e.    Friedberg further flagged for the employees executing the transactions that "we're going to have to do this a few times over the next few days."

201.    Friedberg had even been explicitly informed that the use of Signal was an issue. A former compliance executive told Friedberg it was necessary to communicate on email or Slack, to ensure a record was kept for compliance purposes, but Friedberg only communicated about certain topics on Signal to avoid creating a record on the FTX Group system. Another employee, discussing an entity designed to hire or contract out administrative resources for the FTX Group, told Friedberg that "requests over Signal and Slack will disappear without a record of the request, while email requests can be retained in our records and used to demonstrate that the work was done for a specific entity (and privilege hasn't been waived)."

202.    Friedberg also affirmatively set out to destroy records that had been created. He asked an FTX US lawyer to grant him administrative permission to permanently delete files, and then wrote "that allowed me to delete the 'deleted files' on DropBox."

203.    Bankman-Fried has confirmed that Friedberg authored the document retention policy for the FTX Group.[21] However, rather than establish appropriate record-keeping and internal controls, Friedberg encouraged using—and indeed himself used—tools for obscuring

---

[21]  Trial Tr. 2174:3-16.

transactions, including between the FTX Group and FTX Insiders. Bankman-Fried has also confirmed that he spoke with Friedberg about implementing an auto-delete policy on Signal.[22]

### H.   Certain FTX Insiders Reward Friedberg For His Loyalty

204.   In return for his loyalty, certain FTX Insiders provided Friedberg with lavish rewards.

205.   Upon joining the FTX Group, Friedberg received a $1.4 million signing bonus and 8% equity in FTX US.

206.   Friedberg also received 102,321,118 SRM tokens, in connection with his role in setting up the Serum ecosystem and attempting to procure marketing services for it. This matches the SRM included in Friedberg's Customer Proof of Claim.

207.   Friedberg also received options to purchase FTX and FTX US shares and opportunities to purchase FTX and FTX US shares.

208.   Friedberg also received options to purchase various tokens from Cottonwood Grove Ltd., including:  57,059 FTT, 2,141,667 OXY, and 1,285,000 MAPS. These options match the options included in Friedberg's Customer Proof of Claim.

209.   In June 2021, Friedberg received a $3,007,451.30 cash bonus payment from Alameda.

### IV.   THE PLAINTIFFS WERE INSOLVENT AT ALL RELEVANT TIMES AND, WITH FRIEDBERG'S ASSISTANCE, ENGAGED IN NUMEROUS ACTIVITIES TO HINDER, DELAY, AND DEFRAUD CREDITORS

210.   From the very beginning, the Plaintiffs' implosion was inevitable. As alleged in the superseding indictment of Bankman-Fried, the FTX empire was built on a house of cards.

---

[22]   Trial Tr. 2212:23-2213:3.

"[F]rom at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled ... through a pattern of fraudulent schemes ... ."   Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

211.    The Plaintiffs failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.   The Plaintiffs concealed their failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets deposited by customers.   The Plaintiffs and their senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the Plaintiffs' capital structure.   As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection."  *Id.* ¶ 4.

212.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda or North Dimension.  At the same time, although the Plaintiffs' exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

213.   Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit."  As of the commencement of the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda's "line of credit" to $65 billion. Alameda lacked the ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

214.   Nor was the FTX Insiders' insatiable need for funds limited to propping up the Plaintiffs in the face of extreme risk and management failures.  Bankman-Fried and the FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers.  The Plaintiffs' improper outflows and expenditures are staggering.  Billions of dollars were spent on purported "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, political contributions, and "investments" made with little or no apparent due diligence.

215.   The FTX Insiders' misappropriation of customer funds rendered Plaintiffs insolvent at all relevant times.  On November 2, 2023, having heard evidence of staggering embezzlement of billions of dollars of customer funds, a jury found Bankman-Fried guilty on all counts.[23]  However, even without accounting for distorting effects of Bankman-Fried's staggering fraud, at all relevant times the Plaintiffs' liabilities far exceeded the fair value of their assets, Plaintiffs had inadequate and unreasonably small capital to operate their businesses, and the Plaintiffs lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and

---

[23]   Trial Tr. 3252:3–3254:24.

their creditors' claims. The Plaintiffs continued to operate only by continually concealing and lying to customers and other creditors about their financial condition and misuse of customer funds.

## V.     THE DEBTORS FILE FOR BANKRUPTCY AND THE FTX INSIDERS ADMIT TO WRONGDOING

216.    In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John Ray. Friedberg had resigned two days earlier.

217.    On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

218.    The FTX Insiders' conduct is currently the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the CFTC, and investigations by a host of regulators. Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the Debtors. All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.

219.    On December 19, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud. In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat currencies and

cryptocurrencies.[24] Using these "special privileges," the FTX Insiders frequently caused Alameda to misappropriate funds from the FTX.com exchange for their own benefit.

220.    Also on December 19, 2022, Ellison pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.[25]

221.    On February 28, 2023, Singh pleaded guilty to wire fraud and aiding and abetting the same and conspiracy charges, including conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to violate federal campaign finance laws.[26]

222.    On September 7, 2023, Ryan Salame pleaded guilty to conspiracy to make unlawful political contributions and defraud the Federal Election Commission and conspiracy to operate an unlicensed money transmitting business.[27]

223.    The Securities and Exchange Commission charged Wang and Ellison in a parallel proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-issued exchange crypto security token.  Ellison and Wang also entered into consent orders with

---

[24]   Wang Plea Agreement (Information & Waiver of Indictment) and Plea Tr. 24:6-10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7, 21.

[25]   Ellison Plea Agreement (Information & Waiver of Indictment) and Plea Tr. 10:18-15:11, *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9, 19.

[26]   Singh Plea Agreement (Superseding Information & Waiver of Indictment) and Plea Tr. 7:20-19:16, *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91, 102.

[27]   Salame Plea Agreement (Superseding Information & Waiver of Indictment) and Plea Tr. 8:1-12:17, *United States v. Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF Nos. 262, 265, 283.

the CFTC as to their liability for engaging in fraud in violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[28]

224.    On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire fraud, as well as four counts of conspiracy to commit wire, securities, and commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[29]  On November 2, 2023, after five weeks of trial and approximately four hours of deliberation, the jury in the criminal case found Bankman-Fried guilty on all seven counts of fraud, conspiracy, and money laundering.

---

[28]  *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022); *Commodity Futures Trading Commission v. Bankman-Fried, Ellison, & Wang*, Case No. 1:22-cv-10503-PKC (S.D.N.Y. Dec. 21, 2022).

[29]  *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

## CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duties
### (by all Plaintiffs)

225.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

226.    Friedberg owed fiduciary duties of good faith, loyalty, and care to FTX, FTX US., WRS, and Alameda as a high-ranking corporate and legal officer of each entity.

227.    Friedberg breached his fiduciary duties by, among other things:

a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.    Contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

c.    Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

d.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities, for misuse by the FTX Insiders for their personal benefit;

e.    Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

f.    Participating in and directing misrepresentations to regulators and potential violations of regulations and law;

g.    Attempting to interfere in KYC protocols for the benefit of his friends;

h.    Authorizing wasteful marketing agreements which benefitted his friends;

i.    Authorizing wasteful bank investments which benefitted his friends;

j.    Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

k.   Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

228.   Friedberg failed to exercise any meaningful oversight over the FTX Group's affairs.

229.   Friedberg, in breaching his fiduciary duties of care, loyalty, and good faith, showed a conscious disregard for the best interests of the FTX Group and their creditors.

230.   As a direct and proximate result of Friedberg's breaches of duty, the Plaintiffs were damaged in an amount to be determined at trial.

<u>**COUNT II**</u>
<u>**Aiding and Abetting Breaches of Fiduciary Duties**</u>
**(by all Plaintiffs)**

231.   Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

232.   Bankman-Fried, Wang, Ellison, and other top executives of the FTX Group breached their fiduciary duties by, among other things: (1) secretly diverting funds from FTX and FTX US for their own personal benefit; (2) orchestrating improper purported personal "loans" from the FTX Group for their own personal benefit; and (3) using FTX Group funds to purchase real estate and other assets for their own personal benefit or use.

233.   Friedberg aided and abetted these breaches of duties by, among other things:

a.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.   Contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

c.   Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

d.   Participating in and enabling a fraudulent scheme, including through North Dimension, to channel millions of dollars in customer funds which were subsequently commingled with other FTX Group funds and misappropriated by the FTX Insiders;

e. Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

f. Participating in and directing misrepresentations to regulators and potential violations of regulations and law;

g. Attempting to interfere in KYC protocols for the benefit of his friends;

h. Authorizing wasteful marketing agreements which benefitted his friends;

i. Authorizing wasteful bank investments which benefitted his friends;

j. Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

k. Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

234.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

## COUNT III
## Legal Malpractice / Professional Negligence
### (by all Plaintiffs)

235.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

236.    Between January 2020 and November 2022, Friedberg's job function was synonymous with that of a Chief Legal Officer of the FTX Group.

237.    Friedberg was also retained as an attorney by Alameda and FTX US at various times before he became an FTX Insider in January 2020.

238.    During these time periods, Friedberg acted as the attorney of the aforementioned entities and provided legal services and advice to them.

239.    Friedberg owed Plaintiffs a duty to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession in providing legal services and advice to the Plaintiffs.

240. Friedberg failed to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession by:

    a. Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b. Contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

    c. Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

    d. Participating in and enabling a fraudulent scheme, including through North Dimension, to channel millions of dollars in customer funds which were subsequently commingled with other FTX Group funds and misappropriated by the FTX Insiders;

    e. Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

    f. Participating in and directing misrepresentations to regulators and potential violations of regulations and law;

    l. Attempting to interfere in KYC protocols for the benefit of his friends;

    g. Authorizing wasteful marketing agreements which benefitted his friends;

    h. Authorizing wasteful bank investments which benefitted his friends;

    i. Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

    j. Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

241. As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

**COUNT IV**
**Corporate Waste**
**(by all Plaintiffs)**

242. Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

243.    Friedberg facilitated billions of dollars in purported "loans" to FTX Insiders.  These purported "loans" had no legitimate business purpose that would benefit Plaintiffs and were made purely for the personal gain of the FTX Insiders.  At the time each FTX Insider entered into a personal "loan," Friedberg knew or should have known that each "loan" was not going to be repaid or could not be repaid.  The purported "loans" to FTX Insiders transferred billions of dollars of Plaintiffs' corporate assets in exchange for fraudulent promises to repay—no real consideration at all.

244.    Friedberg participated in and facilitated billions of dollars in purported personal "loans" despite knowing, or being indifferent to the fact, that such funds being transferred were from commingled customer and corporate funds.

245.    Despite knowing that the loans would not be repaid, Friedberg further misrepresented to FTX Group's accountants that such loans would be paid off quarterly.

246.    Further, Friedberg facilitated and directed the creation of shell companies which had no legitimate business purpose and were designed to enrich FTX Insiders.

247.    Further, Friedberg facilitated the overpayment of millions of dollars to Marketer-1 and his companies for marketing services, many of which were undelivered.

248.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

### COUNT V
### Aiding and Abetting Waste of Corporate Assets
### (by all Plaintiffs)

249.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

250.    Friedberg was involved in the day-to-day management of the FTX Group, overseeing all legal services and transactions.

251.    As such, Friedberg was aware of and facilitated the abusive waste of assets by FTX Insiders and sought to conceal the true extent of the underlying fraud and other misconduct by the FTX Insiders.

252.    In his role as General Counsel, Chief Regulatory Officer, and Chief Compliance Officer, and a formal or de-facto officer at FTX Group, Friedberg failed to implement virtually any of the systems or internal controls that are necessary for businesses entrusted with customer assets.

253.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

## COUNT VI
## Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550
### (by all Plaintiffs)

254.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

255.    Friedberg was paid an annual salary of $300,000.  In addition, on June 15, 2021, Plaintiff Alameda paid a $3,007,451.30 bonus (the "2021 Alameda Bonus") to Friedberg.

256.    The aforementioned payments were transfers of property of the Plaintiffs.

257.    Those transfers were made to Friedberg for, and in connection with, Friedberg's and the other FTX Insiders' misconduct as alleged herein.  Thus, the transfers were in furtherance of a fraudulent scheme to hinder, delay, or defraud creditors.

258.    Multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the aforementioned transfers, including that:

a.    The transfers was part of a scheme to enrich and otherwise benefit the FTX Insiders and Friedberg.

b.    Material facts relating to the transfer were concealed.

    c.      Friedberg removed or concealed Plaintiffs' assets.

    d.      The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred.

    e.      Plaintiffs were insolvent when, or became insolvent shortly after, the transfer was made; and

    f.      The transfer occurred shortly before or shortly after Plaintiffs incurred substantial debts.

259.    Accordingly, the transfers should be avoided as fraudulent pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

<u>**COUNT VII**</u>
<u>**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550**</u>
**(by all Plaintiffs)**

260.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

261.    Friedberg was paid an annual salary of $300,000. In addition, on June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

262.    The aforementioned payments were transfers of property of the Plaintiffs.

263.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the foregoing payments because Friedberg's conduct as an employee of the Plaintiffs did snot provide any benefit to them, but rather centered around acting for the benefit of FTX Insiders and to the Plaintiffs' detriment.

264.    Each of the Plaintiffs (a) was insolvent on the date of the transfer, (b) became insolvent as a result of the transfer; (c) was engaged in a business or a transaction for which any

property remaining with the Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiffs' ability to repay as such debts matured.

265.    Accordingly, the transfer should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## <u>COUNT VIII</u>
### <u>Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550</u>
**(by Alameda Research LLC)**

266.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

267.    On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.  The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.

268.    Plaintiffs received less than reasonably equivalent value in exchange for the transfer.  Because Friedberg was an officer of the Plaintiffs, the transfer was for the benefit of an insider under an employment agreement.  Further, the transfer was not in the ordinary course of business for various reasons, including because Alameda was insolvent at the time the 2021 Alameda Bonus was made and the bonus was for conduct detrimental to Alameda.

269.    Accordingly, the transfer should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT IX
### Fraudulent Transfer Pursuant to Del. Code Ann. Tit. 6, § 1304(a)(1)
### and 11 U.S.C. §§ 544(b) and 550
### (by all Plaintiffs)

270.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

271.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.    Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

272.    Friedberg was paid an annual salary of $300,000, a $1.4 million signing bonus, 8% equity in FTX US, and performance-based annual bonuses.  On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

273.    The aforementioned payments were transfers of property of the Plaintiffs.

274.    FTX US redeemed Friedberg's 8% equity through a payment of $28,695, which constitutes the proceeds of the transferred property of the Plaintiffs.

275.    In addition, in July 2020, the FTX Group caused Friedberg to be granted 102,321,128 Serum tokens as well as, potentially, other transfers of cryptocurrencies or assets.

276.    The ability to obtain the Serum tokens was an opportunity of the Plaintiffs because of, among other things, Alameda's membership in the Serum Foundation.  Therefore, that opportunity was property of the Plaintiffs, and the transfer of Serum tokens to Friedberg was a transfer of property of the Plaintiffs.

277.    On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.  The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.  Each of the transfers is avoidable by creditors who hold allowable unsecured claims.

278.    Those transfers were made to Friedberg for, and in connection with, Friedberg's and the other FTX Insiders' misconduct as alleged herein.  Thus, the transfers were in furtherance of a fraudulent scheme to hinder, delay, or defraud creditors.

279.    Multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the 2021 Alameda Bonus, including that:

    a.    The transfers was part of a scheme to enrich and otherwise benefit the FTX Insiders and Friedberg.

    b.    Material facts relating to the transfer were concealed.

    c.    Friedberg removed or concealed Plaintiffs' assets.

    d.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred.

    e.    Plaintiffs were insolvent when, or became insolvent shortly after, the transfer was made; and

    f.    The transfer occurred shortly before or shortly after Plaintiffs incurred substantial debts.

280.    Accordingly, the transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## COUNT X
## Fraudulent Transfer Pursuant to Del. Code Ann. Tit. 6, § 1304(a)(2)
## and 11 U.S.C. §§ 544(b) and 550
## (by all Plaintiffs)

281.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 of the First Amended Complaint as though the same were set forth in full herein.

282.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.   Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

283.    Friedberg was paid an annual salary of $300,000, a $1.4 million signing bonus, 8% equity in FTX US, and performance-based annual bonuses.  On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

284.    The aforementioned payments were transfers of property of the Plaintiffs.

285.    FTX US redeemed Friedberg's 8% equity through a payment of $28,695, which constitutes the proceeds of the transferred property of the Plaintiffs.

286.    In addition, in July 2020, the FTX Group caused Friedberg to be granted 102,321,128 Serum tokens as well as, potentially, other transfers of cryptocurrencies or assets.

287.    The ability to obtain the Serum tokens was an opportunity of the Plaintiffs because of, among other things, Alameda's membership in the Serum Foundation.   Therefore, that opportunity was property of the Plaintiffs, and the transfer of Serum tokens to Friedberg was a transfer of property of the Plaintiffs.

288.     On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.  The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.

289.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the aforementioned transfers (the "Fraudulent Transfers").  Friedberg's conduct as General Counsel for Alameda did not provide any benefit to Alameda, but rather centered around acting for the benefit of FTX Insiders and to Alameda's detriment.

290.     Each of the Plaintiffs (a) was insolvent on the date that each transfer was made; (b) became insolvent as a result of these transfers; (c) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (d) intended to incur, or believed it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

291.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

292.     Accordingly, the transfers should be avoided as fraudulent pursuant to Del. Code Ann tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## COUNT XI
## Disallowance of Claims Pursuant to 11 U.S.C. § 502(d)
### (by all Plaintiffs)

293.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 224 and 254 through 292 of the First Amended Complaint as though the same were set forth in full herein.

294.    As alleged above, Friedberg is a transferee of transfers avoidable under sections 544 and 548 of the Bankruptcy Code and is a person from whom property is recoverable under section 550 of the Bankruptcy Code.

295.    By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, any claims of Friedberg that have been or will in the future be asserted in the Plaintiffs' Chapter 11 Cases should be disallowed unless and until Friedberg has relinquished to Plaintiffs the property transferred, or has paid the Plaintiffs the value of such transferred property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against Defendant and grant the following relief:

(a)    Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b)    Disgorgement of all of Defendant's compensation paid by Plaintiffs;

(c)    Avoid the fraudulent transfers to or for the benefit of Defendant, and direct Defendant to return to Plaintiffs the transferred property or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

(d)     Disallow any claims of Friedberg that have been or will in the future be asserted in the Plaintiffs' Chapter 11 Cases unless and until Friedberg has relinquished to Plaintiffs the property transferred, or has paid the Plaintiffs the value of such transferred property;

(d)     Award Plaintiffs punitive damages in an amount to be determined at trial resulting from Defendant's conscious, willful, wanton, and malicious conduct, which exhibits a reckless disregard for the interests of Plaintiffs and their creditors;

(e)     Award Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(f)     Award Plaintiffs' reasonable and necessary attorney's fees and expenses, together with all costs of court, and investigation expenses; and

(g)     Grant Plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: January 18, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

By:    */s/ Matthew B. McGuire*
       Adam G. Landis (No. 3407)
       Matthew B. McGuire (No. 4366)
       Kimberly A. Brown (No. 5138)
       Matthew R. Pierce (No. 5946)
       919 Market Street, Suite 1800
       Wilmington, Delaware 19801
       Telephone: (302) 467-4400
       Facsimile: (302) 467-4450
       E-mail: landis@lrclaw.com
                mcguire@lrclaw.com
                brown@lrclaw.com
                pierce@lrclaw.com

       *Counsel for the Debtors*
       *and Debtors-in-Possession*

       -and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
William A. Burck (*pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com

Sascha N. Rand (*pro hac vice*)
Katherine A. Lemire (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com
katherinelemire@quinnemanuel.com

William R. Sears (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-7000
willsears@quinnemanuel.com

*Special Counsel to the Debtors*